989 A.2d 256

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
FAREED M. GANDHI, DEFENDANT–APPELLANT.

Argued October 26, 2009—Decided February 23, 2010.

164

*Warren S. Hecht* argued the cause for appellant.

*Patricia B. Quelch,* Assistant Prosecutor, argued the cause for respondent (*Luis A. Valentin,* Monmouth County Prosecutor, attorney; *Ms. Quelch* and *Mary R. Juliano,* Assistant Prosecutor, on the briefs).

*Daniel I. Bornstein,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Anne Milgram,* Attorney General, attorney).

*Michael J. Sullivan* submitted a brief on behalf of amicus curiae Association of Criminal Defense Lawyers of New Jersey (*Coughlin Duffy,* attorneys; *Mr. Sullivan, Mark K. Silver,* and *Michael J. Goldstein,* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

Stalking victims live in a nightmarish world of fear, never knowing when and where they are being watched, are being followed, or will be confronted by the unwelcome presence of their stalker. Victims often are forced to seek protection through the courts. The security that a stalking victim may derive from a judicial no-contact order is dependent, however, on the perpetrator's incentive to comply with the order. Incentive is provided, in part, from the Legislature's determination to make a stalker's repeated violation of such orders an offense of the third degree, which carries the prospect of a significant period of imprisonment. In this matter, we review an appeal of a defendant who refused to comply with sequential no-contact orders.

Defendant Fareed M. Gandhi was convicted of two counts of fourth-degree stalking, *N.J.S.A.* 2C:12–10(b),[1] and, in the second portion of his bifurcated trial, of having stalked his victim in violation of no-contact orders, which elevated his stalking convictions to offenses of the third degree, *N.J.S.A.* 2C:12–10(c). Defendant also was convicted of eleven counts charging fourth-degree contempt of court for disobeying judicial orders, *N.J.S.A.* 2C:29–9(a).

The no-contact orders and the subsequent convictions stemmed from defendant's obsessive attachment to M.G., a young woman

---

[1] Unless otherwise noted, all references within this opinion to the anti-stalking statute, *N.J.S.A.* 2C:12–10, are to the version that was in effect at the time of defendant's arrest, prosecution and conviction, *L.* 2001, *c.* 220, § 2 (current version at *N.J.S.A.* 2C:12–10 (2009)).

who did not return his affection. During the eighteen months that preceded his conviction, defendant manifested a deep-seated, troubling infatuation with M.G. The infatuation permeated his interactions with her and her family and motivated him to send insistent and alarming unilateral communications directed at her. When M.G. could not convince him to leave her alone, she turned to the courts and law enforcement for assistance and protection. As a result of defendant's persistent behavior in repeated violation of judicial no-contact orders designed to shield M.G. from his unwanted advances, a grand jury returned the two indictments that led to his convictions.

On appeal defendant contends that the trial court's jury charge on stalking, which followed the 2001 model jury charge on stalking then in effect, was insufficient because it did not explicitly require the jury to find that a defendant had the conscious object to induce, or awareness that his conduct would cause, fear of bodily injury or death in his victim. Although the Appellate Division affirmed defendant's conviction, the panel agreed with defendant's argument that the offense's culpability requirement applied both to "the [defendant's] conduct and the result of the conduct."[2] We, however, find defendant's position to be unsustainable.

The anti-stalking statute that criminalized defendant's actions provided that a person is guilty of stalking "if he purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear bodily injury to himself or a member of his immediate family or to fear the death of himself or a member of his immediate family." *N.J.S.A.* 2C:12–10(b). Based on that language and the history of this

---

[2] The panel's opinion further noted that since the date of defendant's trial the model jury charge on stalking had been revised to include, as an element, "that when defendant engaged in the course of conduct, he/she had a conscious object or was aware that the course of conduct would cause a reasonable person to be in fear of bodily injury or death to himself/herself or to his/her immediate family." *Model Jury Charges (Criminal)*, Stalking (May 2007). The 2007 revision resulted from an unpublished decision of the Appellate Division that adopted a similar analytical approach as the panel took in the case at bar.

statutory offense, we do not discern a legislative intent to limit the reach of the anti-stalking statute to a stalker-defendant who purposefully intended or knew that his behavior would cause a reasonable person to fear bodily injury or death. Rather, we read the offense to proscribe a defendant from engaging in a course of repeated stalking conduct that would cause such fear in an objectively reasonable person. We view the statute's course-of-conduct focus to be on the accused's conduct and what that conduct would cause a reasonable victim to feel, not on what the accused intended. Indeed, a person accused of stalking conduct very well may have intended to be amorous, but if he or she purposefully or knowingly engages in course of conduct and the effect of that conduct is terrorizing to a reasonable victim, then the anti-stalking statute criminalizes the conduct.

We hold that the statutory offense reaches and punishes a person who engages in a course of stalking conduct even if the person is operating under the motivation of an obsessed and disturbed love that purportedly obscures appreciation of the terror that his or her conduct would reasonably cause to the victimized person. Because we disagree with the statutory interpretation urged by defendant, and because we also find no merit to his other assertions, we affirm defendant's conviction and remand for the resentencing ordered by the Appellate Division.[3]

## I.

Defendant initially met the young woman who would become the victim of his obsession through a mutual friend: the

---

[3] In his petition for certification, defendant also claimed error in the verdict sheet presented to the jury; in the pre-trial ruling on the admissibility of a statement he made to police; and in the validity of the no-contact orders entered against him that were used to elevate his stalking conviction from the fourth to the third degree. Because the Appellate Division had ordered a remand for resentencing in accordance with State v. Natale, 184 N.J. 458, 495–96, 878 A.2d 724 (2005), and State v. Thomas, 188 N.J. 137, 152–53, 902 A.2d 1185 (2006), other sentencing issues that had been raised by defendant before the Appellate Division became moot.

brother of M.G.'s boyfriend. Defendant and M.G. never had a romantic relationship; theirs was only a social friendship. The relationship took an alarming turn in January 2002, however, when defendant was driving M.G. home one evening. Swerving his automobile in an erratic manner, defendant confessed his love, told her that he could care for her better than anyone, and asserted that if he could not have her, no one would. M.G. managed to calm him enough to convince him to take her home. The incident signaled the beginning of a course of conduct that devolved into sexually graphic and threatening computer messages directed at M.G., which contained the details of defendant's desire to have sex with her.[4] After defendant disregarded M.G.'s repeated requests that he stay away from her, she used several of his messages to support a harassment complaint filed against him in May 2002.

At a July 11, 2002, appearance in Red Bank Municipal Court, defendant, while represented by counsel, agreed never to contact M.G. again. In consideration of that promise, M.G. agreed to withdraw her complaint. The municipal judge, Judge Himelman, accepted the agreement between the parties but, in connection with entering his disposition dismissing the complaint, the judge also issued an oral restraining order directing defendant not to

> have any contact with [M.G. or her boyfriend], either directly or indirectly.... That means no letters, things on the window of the car, don't send her flowers, no conversation, nothing.... You stay away. If you do, if you violate the order and she signs a complaint, and if I in fact find that in fact you did that, you're going to go to jail.

---

[4] We see no need to detail the content of those sexually themed communications any more than is necessary to provide context to the serial court applications made by M.G. to halt these unwelcome and disturbing messages. By way of example only, one message from defendant asserted his intention that "he was going to lose his virginity to [M.G.], whether [she] liked it or not." We find that assertion, coupled with defendant's subsequent unpredictable and frighteningly insistent reappearances in proximity to M.G. or at her home, sufficiently threatening of bodily harm to bring defendant's conduct within the prohibition of the anti-stalking statute.

Notwithstanding the court's order and warning to defendant, and defendant's agreement to the court's terms, on October 23, 2002, he showed up at the door to M.G.'s home where she resided with her mother and father. Her father immediately reminded defendant of the court order, to which defendant replied, "I don't care." He departed, however, when M.G.'s father told a family member to telephone the police. The incident prompted the filing of another harassment complaint against defendant. On November 7, 2002, defendant was served with a criminal complaint and processed at the local police department. Sergeant Joshua Berbrick administered *Miranda*[5] warnings to defendant. After defendant waived his rights, Berbrick asked defendant what happened. Defendant calmly replied that "he didn't care what happened. He said he was going to kill [M.G.'s] family and then he was going to impregnate her and when the baby was born, he was going to kill himself so he could live on forever." Startled by this non-responsive, unexpected, and disconcerting declaration, Berbrick ended his interview with defendant.

A few days later, on November 15, 2002, defendant telephoned M.G.'s family residence three times, asking to speak with her. Her father denied defendant's requests and reported the calls to the police. On November 18, 2002, defendant returned to M.G.'s home. This time, while M.G.'s mother called the police, M.G.'s father allowed defendant into the home because he wanted to ensure that defendant would be present when the police arrived.

Sergeant Berbrick was among the officers who responded. By then, defendant, after cursing at M.G.'s father for thwarting his attempt to see M.G., had stepped outside the house. At the officers' direction, he moved further from the home. Sergeant Berbrick first asked M.G.'s father, who appeared visibly shaken by the incident, what had happened. Berbrick then approached defendant and asked him what happened. Defendant's immediate response was to tell Berbrick, in no uncertain terms, that "he

---

5 *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

didn't care what the judge said, he was going to come there. He said if we put him in jail, it didn't matter; the day he got out of jail, he was going to come back there anyway." [6] Defendant was arrested and charged with stalking.

The next day, on November 19, 2002, Judge Blum, the presiding judge of the municipal court, set bail and included, as a condition, "NO VICTIM CONTACT NO RETURN TO SCENE." Defendant posted bail six days later on November 25, 2002, and was released. Thereafter, on March 12, 2003, a grand jury returned an indictment charging defendant with one count of third-degree stalking between May 2002 and January 2003, in violation of a pre-existing court order. *See N.J.S.A.* 2C:12–10.

For approximately six months beginning in January 2003, defendant refrained from contacting M.G. until, on June 14, 2003, he resumed sending sexually explicit and physically threatening messages to M.G., now through the mail. As a result, his bail was revoked and he was incarcerated. At a bail hearing conducted by Judge DeStefano, the court increased the amount of bail, and continued and expanded the existing no-contact order to prohibit any contact with the victim and her family. Defendant remained incarcerated following the increase in bail, but he persisted in sending graphic and disturbing mail to M.G.'s family residence. He was prolific: at trial, the State introduced 142 pages of handwritten letters sent by defendant to M.G.

For his most recent letter-writing campaign, a grand jury returned a second indictment against defendant on April 28, 2004, charging one count of third-degree stalking between July 3, 2003 and February 11, 2004, in violation of an existing court order, *see N.J.S.A.* 2C:12–10, and twelve counts of contempt of court citing specific instances in which defendant was alleged to have purposefully or knowingly disobeyed Judge Blum's "and/or" Judge DeSte-

---

[6] This statement, when introduced at trial, was sanitized at the court's direction. Berbrick testified that defendant stated that he did not care what "anybody" said.

fano's orders, in violation of *N.J.S.A.* 2C:29–9. Prior to trial, one count of contempt was dismissed.

Both indictments were tried in a bifurcated jury trial. During the first portion of the trial that was dedicated to proving the stalking charges, all references to the prior proceedings between the parties and to defendant's incarceration were sanitized. The jury convicted defendant of two counts of fourth-degree stalking. In the second portion of the trial, the jury learned about the no-contact orders for purposes of considering the elevation of defendant's stalking convictions to the third degree and in order to evaluate the contempt-of-court charges. Defendant was convicted of two counts of third-degree stalking in violation of a court order, *N.J.S.A.* 2C:12–10(c), and eleven counts of fourth-degree contempt of court, *N.J.S.A.* 2C:29–9(a). The trial court merged the eleven contempt convictions into one of the stalking convictions and sentenced defendant to two consecutive five-year terms.

Defendant appealed. The Appellate Division, in an unpublished opinion, agreed with defendant's argument that a conviction for stalking requires a showing of defendant's purpose or knowledge of the impact of his behavior on his victim and, further, requires a showing that the conduct was repeated. However, the Appellate Division held that the trial court's instruction to the jury, which tracked the model jury charge for stalking, satisfactorily expressed those requirements. Rejecting defendant's other arguments about certain deficiencies in the verdict sheet, the inadmissibility of a statement made by defendant to police, and the alleged insufficiency of the no-contact orders as a basis on which to elevate the convictions to the third degree, the panel affirmed defendant's conviction. A remand was directed to permit resentencing for an error conceded by the State.[7]

We granted defendant's petition for certification. 199 *N.J.* 518, 973 *A.*2d 385 (2009).

---

[7] The State conceded that defendant must be re-sentenced in light of *Natale, supra,* 184 *N.J.* 458, 878 *A.*2d 724.

## II.

### A.

Defendant, joined by amicus, the Association of Criminal Defense Lawyers of New Jersey (ACDL), contends that the Appellate Division properly determined that the knowing or purposeful culpability requirement in the anti-stalking statute applies to both the conduct with which he was charged and the result of his conduct. However, they argue that the Appellate Division should not have concluded that the jury charge, as a whole, provided the jury with a proper statement of those elements.

The trial court relied on the then-current model jury charge for stalking at defendant's trial. The court instructed the jury that it must find two elements in order to convict defendant:

> In order for you to find the defendant guilty of stalking, the State must prove each of the following elements beyond a reasonable doubt. There's two of them.
>
> The first element is that the defendant purposefully or knowingly engaged in a course of conduct directed at a specific person; and, second, that the defendant's conduct was such that it would cause a reasonable person to fear bodily injury or death to herself or to a member of her immediate family.

That instruction was given over defense counsel's objection. Counsel argued that a third element had to be proved: that defendant had a conscious object to produce, or was otherwise aware of, the effect his conduct would have on M.G. In colloquy, the trial court restated the additional element that defendant was requesting as follows:

> A conviction [for] stalking requires proof beyond a reasonable doubt that the defendant intended or knew that his conduct would cause his victim to fear bodily injury to herself or a member of her immediate family or to fear death of herself or a member of her immediate family. Unless you are convinced beyond a reasonable doubt that the defendant Fareed Ghandi's [sic] purpose was to cause such fear in [M.G.], or that he knew it would cause such fear, you must find him not guilty of stalking.

However, because the court disagreed with defendant's interpretation of the statute, it rejected the additional wording that defendant requested.

The State argues that defendant's conviction should stand. Before the Appellate Division, the State contended that the offense of stalking consisted of two elements and was properly set forth in the model jury charge as presented to the jury during defendant's trial. In light of the Appellate Division's ruling that the State bears the burden of proving defendant's state of mind concerning the result of his conduct, the State now contends that defendant's conviction was properly sustained because the jury charge sufficiently conveyed the necessary culpability findings. The amicus New Jersey Attorney General, on the other hand, urges that we outright reject the interpretation advanced by defendant and the ACDL, and accepted by the Appellate Division. According to the Attorney General's position, which is a progression of the arguments made by the State before the Appellate Division, the crime of stalking requires no showing of a defendant's state of mind in respect of the effect that his or her acts might have on a reasonable person. Thus, the Attorney General argues that we should affirm the sufficiency of the model jury charge followed by the trial court.

## B.

Whether the offense of stalking under *N.J.S.A.* 2C:12–10(b) requires a showing that the defendant had to purposely intend or know that his behavior would cause a reasonable victim to fear bodily injury or death is a question of law. It is a well-established principle of appellate review that a reviewing court is neither bound by, nor required to defer to, the legal conclusions of a trial or intermediate appellate court. *See, e.g., Toll Bros. v. Twp. of W. Windsor,* 173 *N.J.* 502, 549, 803 *A.*2d 53 (2002). We therefore examine this question of law de novo. *Ibid.*

When construing a statute, our primary goal is to discern the meaning and intent of the Legislature. See *State v. Smith,* 197 *N.J.* 325, 332, 963 *A.*2d 281 (2009) (citation omitted). In most instances, the best indicator of that intent is the plain language chosen by the Legislature. *See DiProspero v. Penn,* 183 *N.J.* 477,

492, 874 *A.2d* 1039 (2005) (citation omitted). "If the plain language leads to a clear and unambiguous result, then our interpretive process is over." *Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys.*, 192 *N.J.* 189, 195, 927 *A.2d* 543 (2007) (citation omitted). Alternatively, where the plain language of the statute is ambiguous, we turn to extrinsic evidence for guidance. *Id.* at 195–96, 927 *A.2d* 543. "When such evidence is needed, we look to a variety of sources. Central among them is a statute's legislative history." *Id.* at 196, 927 *A.2d* 543; *see DiProspero, supra*, 183 *N.J.* at 492–93, 874 *A.2d* 1039.

Indeed, the Legislature has provided express direction to assist in the process of construing the language of a legislative enactment:

> In the construction of the laws and statutes of this state, both civil and criminal, words and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language.
>
> [*N.J.S.A.* 1:1–1.]

Additional interpretive guidance in respect of criminal statutes is provided by *N.J.S.A.* 2C:2–2(c)(1), which instructs that a statute's culpability requirement generally applies to all elements of a crime, "*unless a contrary purpose plainly appears.*" (emphasis added). The question here is whether the Legislature intended to treat the *result* of a stalker's course of conduct as an element to which the statute's culpability requirement would attach by virtue of *N.J.S.A.* 2C:2–2(c)(1), or whether the Legislature had a contrary purpose for the anti-stalking statute.

Turning to the language of the statutory offense in effect at the time of defendant's indictment and conviction, the anti-stalking statute provided that:

> A person is guilty of stalking, a crime of the fourth degree, if he purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear bodily injury to himself or a member of his immediate family or to fear the death of himself or a member of his immediate family.

[*N.J.S.A.* 2C:12–10(b).][8]

The statute also defined "course of conduct" as "repeatedly maintaining a visual or physical proximity to a person or repeatedly conveying, or causing to be conveyed, verbal or written threats or threats conveyed by any other means of communication or threats implied by conduct or a combination thereof directed at or toward a person." *N.J.S.A.* 2C:12–10(a)(1). As used in that section, "'repeatedly' means on two or more occasions." *N.J.S.A.* 2C:12–10(a)(2).

As noted, defendant argues that the mens rea requirements of purpose or knowledge apply not only to the conduct prohibited, but also to the result of that conduct such that a stalker must intend or be aware of the harm his conduct would cause to a reasonable victim. The State disagreed with that interpretation below. The State's contrary view of the statute's requirements has been advanced further through the submission of the amicus New Jersey Attorney General before this Court. As argued by the Attorney General, the statutory scheme demonstrates a purpose to punish a specific category of behavior that has been carefully described in the statute. While ambiguity in the

---

[8] The statute was amended in 2009 to read as follows:

A person is guilty of stalking, a crime of the fourth degree, if he purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his safety or the safety of a third person or suffer other emotional distress.

[*N.J.S.A.* 2C:12–10(b) (2009).]

The recent modification carries no implications for the precise issue we must address in this appeal. We note merely that through the 2009 amendments the Legislature has continued to expand the statute's applicability to a broader category of behavior. Rather than requiring that a stalker's behavior produce fear of "bodily injury" or "death," the statute presently applies when the behavior would cause a reasonable person to "fear for his safety ... or suffer other emotional distress." In addition, the revisions to the statute have expanded its prohibition beyond threats directed at the victim and the victim's family to include a course of conduct directed at a third person. The Legislature also clarified that the phrase, "cause a reasonable person to fear," "means to cause fear which a reasonable victim, similarly situated, would have under the circumstances." *N.J.S.A.* 2C:12–10(a)(4) (2009).

text of a statute may justify our resort to extrinsic evidence to discern the statute's intended meaning, *see Richardson, supra,* 192 *N.J.* at 195–96, 927 *A.*2d 543, we cannot conclude that there is ambiguity in the text of a statute simply because a disagreement exists about what the words convey. We must start by assessing the reasonableness of the parties' positions based on our own review of the statutory language.

Initial review of the very structure of the anti-stalking statute- specifically the proximity of the adverbs "purposefully" and "knowingly" to the verb they modify—suggests a legislative choice to which we ought to be mindful. When construing the words of a statute, "[w]e are encouraged . . . to 'read and examine the text of the act and draw inferences concerning the meaning from its composition and structure.' " *Smith, supra,* 197 *N.J.* at 333, 963 *A.*2d 281 (quoting 2A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction* § 47:1 (7th ed.2007)). Here, the proximity of "purposefully" and "knowingly" to the verb "engages" emphasizes the relationship of those adverbs to that verb. In contrast, the clause emphasized by defendant that, he argues, is also intended to be modified by those adverbs—"that would cause a reasonable person to fear bodily injury to himself or a member of his immediate family or to fear the death of himself or a member of his immediate family"—is remote from the key modifying adverbs.

An adverb "should generally be placed as near as possible to the word it is intended to modify," *The Chicago Manual of Style* § 5.155 (15th ed.2003), and it should "immediately precede" the phrase, or word other than a verb, that it is intended to modify, *id.* at § 5.156. Because we presume that the Legislature intended to follow accepted rules of grammar, *see N.J.S.A.* 1:1–1, we assume that the Legislature was mindful of the cues sent by placing the modifiers "purposefully" and "knowingly" immediately before the verb "engages." The location of these key words suggests that the legislative intent was to capture *how* a defendant

engages in the type of conduct that is proscribed by the statutory offense.

At the same time, the dependent clause "that would cause a reasonable person to fear bodily injury to himself or a member of his immediate family or to fear the death of himself or a member of his immediate family," which defendant emphasizes, is an adjectival clause, modifying and describing the noun phrase "course of conduct." As such, it describes not *how* a defendant engages in the conduct, but rather the *type* of conduct for which a defendant may be punished.

Moreover, the interjection of the reasonable-person standard within the dependent clause belies any intent by the Legislature to require that, to be guilty of stalking, a defendant must be proved to have had a conscious object to inflict, or awareness that his conduct would inflict, fear of bodily injury or death in his victim. The legislative choice to introduce a reasonable-person standard undercuts defendant's argument that the plain language of the statute calls for application of a subjective standard of knowing or purposeful intent to cause that specific result by the perpetrator. To the contrary, the reasonable-person standard demonstrates a legislative preference for the objective perspective of the fact-finder to assess a reasonable person's reaction to the course of conduct engaged in by the accused stalker.

Ordinarily, when a statute's language appears clear, " 'we need delve no deeper than the act's literal terms to divine the Legislature's intent.' " *State v. Thomas,* 166 *N.J.* 560, 567, 767 *A.*2d 459 (2001) (quoting *State v. Butler,* 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982)). Judging from the language used by the Legislature, the more reasonable interpretation of the statute is that advanced by the amicus, the New Jersey Attorney General, which provides a textually supported construction that places a clear burden on the State and provides a workable standard for fact-finders, while simultaneously meeting the plain legislative goal of protecting victims of stalking behavior. However, to the extent that the statute can be said to contain some lingering measure of ambigui-

ty that gives rise to defendant's interpretative argument, it is permissible to turn to extrinsic evidence to aid in the construction of this statute. *See, e.g., State v. Crawley*, 187 *N.J.* 440, 453, 901 *A.*2d 924 (resorting to legislative history for extrinsic aid in interpretation of statute), *cert. denied*, 549 *U.S.* 1078, 127 *S.Ct.* 740, 166 *L.Ed.*2d 563 (2006).

### C.

In this instance, our conclusion in respect of the language and structure of the statute is bolstered by examination of the legislative history to *N.J.S.A.* 2C:12–10(b). In assessing the reasonableness of the interpretation given to the statute's language by defendant, we cannot but note that his reading of the statute's mens rea requirements ignores many of the legislative enhancements made to the statute since 1999. Defendant maintains that he is in love with M.G., and seems to believe that the obsessive emotions he has for her stem from deep affection. He denies any desire or intention to frighten or harm her by his outpourings of love. Accordingly, based on his interpretation of the statute, he cannot be convicted of stalking because he did not purposefully or knowingly place M.G. in fear of bodily injury or death. The legislative history explicitly demonstrates a contrary legislative intent in respect of the anti-stalking statute's reach, however.

From its inception, New Jersey's anti-stalking statute, originally enacted in 1992, *L.* 1992, *c.* 209, § 1, was "intended to protect victims who are repeatedly followed and threatened." *Assemb. Judiciary, Law & Public Safety Comm. Statement to S., No. 256,* 205th Leg. 1 (N.J.1992). The original version of the statute created a crime of the fourth degree where a defendant "purposely and repeatedly follows another person and engages in a course of conduct or makes a credible threat *with the intent of annoying or placing that person in reasonable fear of death or bodily injury.*" *L.* 1992, *c.* 209, § 1 (emphasis added). The original requirement that a defendant intend to cause fear in his victim was underscored by the statutory definition of "credible threat" as

"an explicit or implicit threat made with the intent and the apparent ability to carry out the threat, so as to cause the person who is the target of the threat to reasonably fear for that person's safety." *L.* 1992, *c.* 209, § 1.

The Legislature revised the statute in 1996, thereby expanding the class of protected individuals while reducing the mens rea applicable to the result of a stalker's conduct:

A person is guilty of stalking, a crime of the fourth degree, if he

(1) Purposefully engages in a course of conduct directed at a specific person that would cause a reasonable person to fear bodily injury to himself or a member of his immediate family or to fear the death of himself or a member of his immediate family; and

(2) Knowingly, recklessly or negligently places the specific person in reasonable fear of bodily injury to himself or a member of his immediate family or in reasonable fear of the death of himself or a member of his immediate family. [*L.* 1996, *c.* 39, § 1.]

The amendment extended protections to include a victim's family members. In addition, the revision deleted both the statutory requirement that a defendant intend to place his victim in fear, and the definitional analogue of creating a "credible threat" with the intent to fulfill it. The revised offense separated the mens rea applicable to the course of conduct from the mens rea applicable to the result of that course of conduct, and required that the State prove both to sustain a conviction. As to the former, the defendant had to purposefully engage in the proscribed course of conduct, which was, for the first time, defined objectively as that which would produce fear of death or bodily injury in a reasonable person. The revised law also required a separate showing in respect of the defendant's mens rea as to the effect of his or her conduct; to be convicted, an accused stalker had to "knowingly, recklessly or negligently" place his or her victim in "reasonable fear." *L.* 1996, *c.* 39, § 1.

The 1996 amendments set the stage for the next set of revisions to *N.J.S.A.* 2C:12–10(b)—those that occurred in 1999—which are the most compelling in the analysis we undertake to resolve the question addressed today. In that year, the Legislature deleted altogether the specific intent requirement applicable to the effect

of a stalker's conduct. Leading up to enactment of this amendatory legislation, an earlier version of the bill sponsored by Senators Cafiero and Allen proposed the following language: "A person is guilty of stalking ... if he ... [p]urposefully engages in a course of conduct directed at a specific person that *the actor knows* would cause a reasonable person to fear bodily injury...." S. 1354 [First Reprint], 208th Leg. (N.J.1998) (emphasis added). Had that proposed language remained, it would have supported the inclusion of the jury charge language sought by defendant. However, subsequent Senate floor amendments deleted the phrase "the actor knows" and "instead insert[ed] 'knowingly' after 'purposefully' to clarify that 'knowing' is a culpable mental state for engaging in the course of conduct that may result in committing stalking." *Statement to [First Reprint] S., No. 1354 with S. Floor Amendments*, 208th Leg. 1 (N.J.1999). Following passage of the amended bill, the anti-stalking statute provided that:

> A person is guilty of stalking, a crime of the fourth degree, if he purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear bodily injury to himself or a member of his immediate family or to fear the death of himself or a member of his immediate family.
>
> [*L.* 1999, *c.* 47, § 1.]

That is the statutory language that was in effect when defendant committed the acts for which he was charged.[9]

Thus, a clear pattern of legislative action, over time, broadened protections for victims of stalkers. First, the Legislature reduced the degree of impact that a defendant's actions must have on the victim, from conduct producing a "reasonable fear of death or bodily injury" or suggesting a "credible threat," *L.* 1992, *c.* 209, § 1, to conduct which "would cause a reasonable person to fear

---

[9] By way of completeness, we note that *N.J.S.A.* 2C:12–10(a) was amended again in 2001 to broaden the prohibited "course of conduct" to include threats made indirectly, and "threats conveyed by any other means of communication" besides verbally or in writing. *L.* 2001, *c.* 220, § 2.

bodily injury [or death]", *L.* 1996, *c.* 39, § 1, and *L.* 1999, *c.* 47, § 1.[10]

Second, the Legislature broadened the class of individuals who may secure protection under the umbrella of the anti-stalking statute. The statute's earliest iteration provided protection to the victim only. *L.* 1992, *c.* 209, § 1. In 1996, it was broadened to encompass the victim and "member[s] of his immediate family." *L.* 1996, *c.* 39, § 1. Based on the potential for certain victims to be unaware of the threat posed by a stalker, the Legislature strengthened protections for children and developmentally disabled adults in 1999. Assemb. 2246 (Sponsor's Statement), 208th Leg. (N.J.1998); *see N.J.S.A.* 2C:12–10.2. The history behind the 1999 modifications notes that under the prior version of the statute, "a person cannot be convicted of stalking unless his repeated acts of threatening behavior actually place the victim in reasonable fear." Assemb. 2246 (Sponsor's Statement), 208th Leg. (N.J.1998).[11]

Third, the Legislature broadened the types of behavior that may constitute a "course of conduct" under the anti-stalking statute. Although the 1992 enactment restricted a very broad category of prohibited conduct, defined as conduct that "alarms or annoys [the victim] and which serves no legitimate purpose," it is also true, as noted, that the statute required that a defendant *intend* to cause alarm or annoyance to the victim. *L.* 1992, *c.* 209, § 1. The 1996 modification altered this reference to the stalker's

---

[10] The degree of impact was lessened further by the 2009 amendments so that the current statute prohibits conduct "that would cause a reasonable person to fear for his safety ... or suffer other emotional distress," *N.J.S.A.* 2C:12–10(b) (2009).

[11] In 2009, the law was expanded further to protect "third persons" associated with the victim, *N.J.S.A.* 2C:12–10(b) (2009), in light of the Legislature's acknowledgement that "stalkers may target third parties other than the victim's family members, such as employers or intimate partners, and that therefore these persons should be protected by the law." *Assemb. Law & Public Safety Comm. Statement to Assemb., No. 1563,* 213th Leg. 1 (N.J.2008).

intent in two ways: by introducing the reasonable-person stan-
dard, and by lessening the mens rea as to the result of the conduct
from intent, to knowledge, recklessness, or negligence. *L.* 1996, *c.*
39, § 1. Moreover, it deleted the intent element from the 1992
description of "course of conduct" and redefined that term to
mean "repeatedly maintaining a visual or physical proximity to a
person or repeatedly conveying verbal or written threats or
threats implied by conduct or a combination thereof directed at or
toward a person." *L.* 1996, *c.* 39, § 1. By 1999, the Legislature
deleted the statutory reference to a defendant's mens rea as to the
impact of the course of conduct altogether. *L.* 1999, *c.* 209, § 1.
In 2001, prohibited conduct was expanded to include situations in
which a stalker indirectly conveys threats through any means of
communication. *L.* 2001, *c.* 220, § 2.[12]

## D.

In view of the ever-broadening trend toward greater re-
strictions on stalking behavior and, correspondingly, greater pro-
tections for victims of that behavior, it would be contrary to the
legislative design to interpret the statute's mens rea proof require-
ment in an overly restrictive way, particularly in light of the
Legislature's deletion of a specific intent requirement from the

---

[12] Once again post-dating the events in this prosecution, we note that, most
recently, the statute was broadened "to cover stalking by means of new technolo-
gy, such as situations where the stalker tracks the victim through the use of a
global positioning system attached to the victim's car." *Assemb. Law & Public
Safety Comm. Statement to Assemb., No. 1563,* 215th Leg. 1–2 (N.J.2008).
Toward that end, the current stalking statute defines the prohibited course of
conduct as

> repeatedly maintaining a visual or physical proximity to a person; directly,
> indirectly, or through third parties, by any action, method, device, or means,
> following, monitoring, observing, surveilling, threatening, or communicating
> to or about, a person, or interfering with a person's property; repeatedly
> committing harassment against a person; or repeatedly conveying, or caus-
> ing to be conveyed, verbal or written threats or threats conveyed by any
> other means of communication or threats implied by conduct or a combina-
> tion thereof directed at or toward a person.
>
> [*N.J.S.A.* 2C:12–10(a)(1) (2009).]

statute in 1999. Moreover, to adopt such an interpretation would be inconsistent with the approach to the mens rea requirements taken in recent decisional law applying *N.J.S.A.* 2C:12–10(b).

Although not squarely on point, our decision in *H.E.S. v. J.C.S.*, 175 *N.J.* 309, 815 *A.*2d 405 (2003), evaluated an appeal by a defendant found to have stalked his estranged wife as a predicate offense to domestic violence. In commencing our analysis of the same version of *N.J.S.A.* 2C:12–10(b) under which defendant Gandhi was convicted, we adopted a prior statement by the Appellate Division of the anti-stalking statute's elements:

1) defendant engaged in speech or conduct that was directed at or toward a person, 2) that speech or conduct occurred on at least two occasions, 3) defendant purposely engaged in speech or a course of conduct that is capable of causing a reasonable person to fear for herself or her immediate family bodily injury or death.[13]

[*H.E.S.*, *supra*, 175 *N.J.* at 329, 815 *A.*2d 405.]

It was the third element—the examination of the impact of defendant's behavior—that drew our focus. In that regard, we instructed that "[t]he relevant inquiry . . . is whether a reasonable person in [the victim's] situation, knowing what [the victim] knew about [the accused stalker] under the totality of the circumstances, would have feared bodily injury as a result of his alleged speech and conduct." *Id.* at 330, 815 *A.*2d 405. Applying the facts of the case to this analytical framework, we concluded that defendant's use of surveillance equipment to follow his estranged wife could cause a reasonable person to fear bodily injury and was "the sort

---

[13] We adopted this statement of the elements from *State v. Cardell*, 318 *N.J.Super.* 175, 183, 723 *A.*2d 111 (App.Div.), *certif. denied*, 158 *N.J.* 687, 731 *A.*2d 46 (1999). *Cardell* implicated a previous version of the anti-stalking statute that had been revised in 1999 and had required a showing of a fourth element to sustain a conviction: that "defendant knowingly, recklessly or negligently caused a reasonable fear of bodily injury or death." *H.E.S.*, *supra*, 175 *N.J.* at 329, 815 *A.*2d 405. As we noted earlier in our discussion of the legislative history surrounding the 1999 revisions to *N.J.S.A.* 2C:12–10(b), "[t]he mental culpability element . . . was changed to 'purposefully or knowingly' by *L.* 1999, *c.* 47, § 1, effective March 12, 1999 and codified at *N.J.S.A.* 2C:12–10b." *H.E.S.*, *supra*, 175 *N.J.* at 329, 815 *A.*2d 405. Our analysis in *H.E.S.*, therefore, did not reach *Cardell's* fourth element.

of behavior that New Jersey's anti-stalking statute was designed to prevent." *Id.* at 330–31, 815 *A.*2d 405.

In the context of the current inquiry before the Court, what is most interesting about our opinion in *H.E.S.*, *supra*, is what was *not* said. Nowhere did we inquire into or focus on the intent of the defendant in producing fear of bodily injury or death in his victim. Quite the contrary, we firmly established that the appropriate examination for the fact-finder is what a reasonable person, imbued with the personal knowledge and experience of the actual victim, would have experienced as a result of the defendant's conduct. *Id.* at 330, 815 *A.*2d 405.

■ In summary, based on the statutory language and the history to the statutory offense of stalking, we do not discern a legislative intent to restrict the applicability of the anti-stalking statute to a stalker-defendant who purposefully or knowingly intended that his course of conduct would cause a reasonable victim to fear bodily injury or death. Rather the plain language of the statutory offense, reasonably read, prohibits a defendant from purposefully or knowingly engaging in a course of conduct, as defined in *N.J.S.A.* 2C:12–10(a)(1), that would cause such fear in an objectively reasonable person. A statute's culpability requirement generally applies to all elements of a crime unless a contrary intent may be discerned. *N.J.S.A.* 2C:2–2(c)(1). Here we find such a contrary intent. We find that the Legislature intended to cast a wide net of protection for stalking victims by broadly prohibiting and punishing persistent, unwanted, and frightening behaviors. The claimed innocent intention of one with an unrequited love interest in another does not permit an individual to stalk the other with impunity. We hold that the statutory offense reaches and punishes one who engages in a course of stalking conduct even if that person is operating under the motivation of an obsessed and disturbed love that purportedly obscures appreciation of the terror that his or her conduct would reasonably cause

to the victimized person. Defendant's claim of error in the jury charge given by the trial court is therefore rejected.[14]

## III.

### A.

Defendant further contends that the no-contact orders, entered in conjunction with the withdrawal of M.G.'s initial harassment complaint, and at subsequent bail hearings, were an insufficient basis on which to find that he engaged in stalking in violation of a court order, thereby elevating his offenses from fourth degree to third degree.

The three no-contact orders include: 1) the July 11, 2002, oral restraining order issued by Judge Himelman, which prohibited defendant from having any contact with M.G. or her boyfriend; 2) the November 19, 2002, bail order and warrant to detain issued by Judge Blum, which included a provision ordering "NO VICTIM CONTACT NO RETURN TO SCENE"; and 3) the June 17, 2003, bail order and warrant to detain issued by Judge DeStefano, which increased the amount of defendant's bail and included a provision ordering "No Victim Contact & Victim's Family ([G.] Family)." First, defendant contends that Judge Himelman lacked jurisdiction to enter his order because, when imposing the order, the court dismissed the case and lost jurisdiction of the matter. Thus, defendant contends, the oral order is not a lawful order on which the State may rely to elevate his stalking to a third-degree offense. Second, he argues that Judge Blum's bail order containing the no-contact provision, if violated, could only warrant the revocation and forfeiture of his bail. Its violation cannot serve as the basis for elevation of stalking to an offense of the third degree. Third, defendant contends that he never violated Judge DeStefa-

---

[14] In light of the inconsistency that our decision creates for the 2007 version of the model jury charge on stalking, which was referenced by the Appellate Division in the decision below, we direct that the Committee on Model Criminal Jury Charges revise the model charge to make it consistent with today's holding.

no's order because the no-contact provision was a condition of bail and defendant was never released on bail.

In respect of the first no-contact order entered against defendant on July 11, 2002, by Judge Himelman, the Appellate Division concluded that there was no jurisdictional infirmity. The trial court found that the municipal court conditioned its acceptance of the dismissal of M.G.'s criminal harassment complaint on the court's issuance of the restraining order against defendant, an order not only consented to by defendant before the court dismissed the complaint, but also one that was urged by defendant's counsel. The Appellate Division concluded that the court's action made the oral order part of its disposition of the municipal court complaint and that, therefore, the court did not lack jurisdiction to enter the no-contact order when it did.

■■■■ We need not reach that issue because, even assuming that there was some basis on which defendant could have attacked the jurisdictional underpinning of Judge Himelman's order (an assumption we make only for purposes of addressing all aspects of defendant's position regarding the use of this order for elevating the stalking conviction), defendant had no ability whatsoever to ignore the no-contact order. Rather, defendant was obligated to obey the order until it was set aside. Restraining orders are entered for purposes of shielding a victim who needs protection and who is compelled to seek judicial assistance to obtain that security; thus, we have insisted on full compliance with restraining orders no matter the flaws a defendant may discern in their form or entry. *See State v. Cassidy,* 179 *N.J.* 150, 159 n. 3, 843 *A.*2d 1132 (2004). As we stated unequivocally in *Cassidy,* "although failure to meet the technical and substantive requirements for a restraining order [may] result[ ] in an invalid order, the order nonetheless has a legal effect until vacated." *Ibid.* Even when a court lacks jurisdiction over a matter at the time an order is issued, a defendant is bound to obey the court's order until the order is vacated through a judicial proceeding. *See State v. Roberts,* 212 *N.J.Super.* 476, 485, 515 *A.*2d 799 (App.Div.1986)

(holding contempt conviction for violation of bail order to be valid under assumption of trial court's jurisdiction until that jurisdiction is determined to be invalid). Similarly, a mere procedural deficiency also does not permit a defendant to intentionally ignore a court order. *See State v. Masculin,* 355 *N.J.Super.* 250, 258, 809 *A.*2d 882 (Ch.Div.2002) (holding temporary restraining order (TRO) valid until set aside).

We insist on compliance with judicial orders to promote order and respect for the judicial process. Compliance is required, under pain of penalty, unless and until an individual is excused from the order's requirements. *See, e.g., Cassidy, supra,* 179 *N.J.* at 159 n. 3, 843 *A.*2d 1132 (citing *Roberts, supra,* 212 *N.J.Super.* 476, 515 *A.*2d 799, and *Masculin, supra,* 355 *N.J.Super.* at 258, 809 *A.*2d 882). Thus, as long as a court order exists and a defendant has knowledge of it, the defendant may be prosecuted for a violation thereof, regardless of its deficiencies. *See, e.g., Masculin, supra,* 355 *N.J.Super.* at 259, 809 *A.*2d 882.

Here it is clear that defendant was well aware of Judge Himelman's July 11, 2002, no-contact order. Defendant appeared in court represented by counsel and agreed not to contact M.G. again. Further, defendant's argument concedes that Judge Himelman's order was never revoked. Because defendant was obligated to abide by the terms of the judicial order until it was vacated, the jury could have relied on the order to elevate both of defendant's stalking convictions to the third degree, had the State chosen to advance that argument in respect of the second stalking charge. However, because the State relied on the no-contact provision in Judge Blum's bail order, as continued in the bail order of Judge DeStefano, to elevate the second stalking charge, we address those orders as well. The no-contact orders in defendant's bail orders did not lose their character as judicial no-contact orders merely because bail consequences could attach for their violation. As judicial no-contact orders, defendant was obligated to strictly comply with them. His actions in flagrant violation of them provided a sufficient basis for elevating his second fourth-

degree stalking charge to an offense of the third degree, as well as providing the bases for the numerous contempt charges filed against him. Finding no merit to defendant's argument that the no-contact orders entered against him were invalid bases on which to seek the elevation of his stalking offenses to the third degree, we turn to the deficiencies identified in the verdict sheet.

### B.

It is asserted before us that the verdict to support elevation of the stalking conviction to the third degree could not have been unanimous because the verdict sheet did not require the jury to specify that it reached unanimous agreement as to which particular no-contact order justified elevation of each of defendant's convictions. We find no evidence in the record that defendant advanced this argument below, although the amicus ACDL makes it a focus in its brief to us and, after oral argument, defendant in a letter to the Clerk of the Supreme Court indicates that he "concur[s] and adopt[s] the arguments presented by the ACDL[,][a]ssuming arguendo that an argument raised by the ACDL in said brief was not explicitly raised in said form by [defendant]."

In the context of this matter, it is fundamentally unfair to have introduced this new argument on appeal, as well as inconsistent with the rules governing appellate practice. As to the latter, we first note that an amicus must take the case on appeal as they find it. *See R.* 1:13–9; *Bethlehem Twp. Bd. of Educ. v. Bethlehem Twp. Educ. Ass'n,* 91 *N.J.* 38, 48–49, 449 *A.*2d 1254 (1982) ("[A]s a general rule an *amicus curiae* must accept the case before the court as presented by the parties and cannot raise issues not raised by the parties."). Moreover, it is unfair of defendant to wait until his matter is before the Supreme Court to advance an argument never raised before the trial court, the Appellate Division, or in his petition for certification. The unfairness is revealed by the fact that, at trial, defendant advanced many issues about the State's reliance on the no-contact orders to elevate his stalking

to a third-degree offense, but did not raise this specific argument which easily could have been addressed.

Indeed, in combing the transcript, it is clear that the defense understood which no-contact orders were being relied on in conjunction with the elevation of each stalking charge, yet this specific alleged deficiency was never claimed. Clearly, had it been, a clarification to the jury could have been provided. Although we decline to allow defendant to advance this issue after oral argument, and through the backdoor of an amicus-added claim of error, we take this opportunity to comment on several aspects of this record to explain our satisfaction that no error of a capacity to cause an unjust result in this regard could have reasonably occurred in defendant's third-degree stalking convictions.

Neither the stalking offense identified in Indictment No. 03–03–457, nor the one identified in Indictment No. 04–04–1007, stated which court order defendant was alleged to have violated. Each stated only that defendant violated a court order and the verdict sheet did not ask the jury to identify a specific order; it referred only to defendant committing the crime of stalking "in violation of an order prohibiting the behavior." [15]

*Rule* 1:8–9 requires that "[i]n every trial by jury the verdict . . . shall be unanimous in all criminal actions." It is well understood that courts should provide "specific unanimity" instructions—that is, impose a requirement that the jury unanimously agree on the facts underlying the guilty verdict—when there is a specific request for those instructions and where there exists a danger of a fragmented verdict. *State v. Parker*, 124 *N.J.* 628, 637, 592 *A.*2d 228 (1991). However, the failure to provide a

---

[15] On the other hand, each contempt count in Indictment No. 04–04–1007 identified a specific order that was alleged to have been violated. Even for the contempt charges, however, the verdict sheet for the second portion of the bifurcated trial did not specify the court order that the jury was finding defendant to have violated.

specific unanimity instruction in the absence of such a request will not necessarily constitute reversible error. *Ibid.* Generally stated, where there is an allegation on appeal that a specific unanimity charge should have been given, "[t]he core question is, in light of the allegations made and the statute charged, whether the instructions as a whole [posed] a genuine risk that the jury [would be] confused." *Id.* at 638, 592 *A.*2d 228 (internal quotation marks and citation omitted) (second and third alteration in original). The reviewing court should examine two factors: whether the acts alleged are conceptually similar or are "contradictory or only marginally related to each other," and whether there is a "tangible indication of jury confusion." *Id.* at 639, 592 *A.*2d 228.

In this matter, defendant did not request specific unanimity instructions pertaining to the no-contact orders. As for the two *Parker* factors, we note that we are not confronting contradictory acts. Each no-contact order expressed generally the same no-contact provisions. During the relevant periods for which he was charged with stalking, there never was a break in time when defendant was not subject to an order of a court directing that he have no contact with M.G. The orders were similar in concept and fully consistent with each other as related to M.G. The bail orders with their respective provisions, issued subsequent to Judge Himelman's order, only continued the no-contact order for M.G. and extended the no-contact protection for M.G.'s family. Because each was related to previous orders, with no break in time when defendant was not subject to a no-contact order during the period charged in the offenses, there was no risk of a fragmented verdict based on contradictory findings.

Equally important is that we are not presented in this record with any basis for concluding that the jury might have been confused about the orders that were being relied on by the State for the two periods of time covered in the stalking counts. For the first stalking count in Indictment No. 03–03–457, the jury was told numerous times that it was the July 11, 2002, order by Judge Himelman that the State was relying on to elevate that offense to

the third degree because of defendant's flaunting of a judicial order. The State explicitly stated to the jury in its opening that "Judge Himelman ordered the defendant to have no contact with [M.G.]. He was in court. He was present. He received notice of that. That order was in effect during the time of the first stalking indictment, the charge that you've already decided." The State also told the jury it was relying on the bail order, first issued by Judge Blum, and continued by Judge DeStefano, for the stalking offense in the second indictment, No. 04-04-1007. Importantly, corresponding statements were made by defense counsel in his opening and closing during the second portion of defendant's bifurcated trial.

Thus, there simply was no ambiguity about the fact that the State only was presenting a violation of Judge Himelman's order for the first stalking count. And the jury was told that it was Judge Blum's no-contact order, continued by Judge DeStefano when bail was increased, that was relied on for the second stalking count. The court's closing instruction to the jury covered these points as well, and added that both the Blum and the DeStefano orders were being used for the specific contempt violations, as the indictment specified. Following the court's instructions, the jury never sought clarification or otherwise expressed uncertainty regarding the execution of its fact-finding duties.

 The defendant and the ACDL now argue, based on *Richardson v. United States*, 526 *U.S.* 813, 119 *S.Ct.* 1707, 143 *L.Ed.*2d 985 (1999), and *State v. Frisby*, 174 *N.J.* 583, 811 *A.*2d 414 (2002), that, because third-degree stalking requires, as an element of the offense, a finding of a "violation," without a specific unanimous finding on which no-contact order was violated, plain error requires reversal. We reject that over-stated application of those cases to the facts of this case. The inescapable conclusion is that the record here is barren of any "tangible indication of jury confusion," *see Frisby, supra,* 174 *N.J.* at 597, 811 *A.*2d 414, about which orders pertained to which stalking count. There was only one under consideration for the stalking count in Indictment No.

03–03–457, namely Judge Himelman's. And although the second stalking count from Indictment No. 04–04–1007, involved two, arguably discrete, bail orders, the orders were functionally the same, the second one continuing in effect, without any break in time of their application, the no-contact provision required as part of defendant's initial bail order. In the absence of a request at trial for a more specific unanimity instruction on the orders being relied on to elevate the two stalking offenses, we are not persuaded that the verdict sheet as worded, and as this case was presented, had any capacity to cause an unjust result.

## IV.

Defendant raises several additional claims of error, which were rejected by the Appellate Division below. Each is addressed in turn.

## A.

First, defendant contends that the verdict sheet was deficient for failing to list all of the elements of the stalking offense, and for failing to list any of the elements of the lesser-included offense of harassment. He also argues that the verdict sheet was inadequate because it failed to require a finding that the prohibited conduct took place "repeatedly."[16]

Following the presentation of the evidence to the jury in the first half of the bifurcated trial, the trial court charged the jury with the elements of a conviction for fourth-degree stalking and the lesser-included offense of harassment. In tandem with the charge, the trial court provided the following direction:

---

[16] To the extent we have confirmed the sufficiency of the trial court's jury charge on the elements of the stalking offense, we address this claim as only asserting that the verdict sheet was deficient because it did not use the word "repeatedly" to describe the behavior needed to sustain a stalking conviction, and because it did not list the elements of harassment.

To assist you in reporting the verdict, I prepared a verdict sheet. You'll have one of those in the jury room with you. As I said, the verdict sheet is not evidence and it's not the charge.... Now any charge that I gave you before we started, during the trial, or now should be treated as one complete charge and not taken out of context. If during your deliberations you have a question or feel that you need further assistance or instructions from me, write your question on a sheet of paper and give it to the officers and the clerk will be standing by the jury room door, and they will in turn give it to me. I will then go over the question with the attorneys and I will try to answer it as quickly as possible.

The judge also stressed the importance of his oral instructions over the content of the verdict sheet.

As to each stalking offense, the verdict sheet read as follows:

1. How do you find ... that FAREED GHANDI [sic] did commit the crime of Stalking, by purposefully engaging in a course of conduct directed at [M.G.] which would cause a reasonable person to fear bodily injury or death to herself or a member of her immediate family?

 Guilty _____ Not Guilty _____

 If you have found the defendant guilty in question 1, go onto question 2. If you have found the defendant not guilty in question 1, go on to question 1a.

1a. How do you find that ... FAREED GHANDI [sic] commit the crime of Harassment?

 Guilty _____ Not Guilty _____

Although it is undisputed that the verdict sheet included the elements of stalking but did not include the elements of the lesser-included offense of harassment, Judge DeStefano orally instructed the jury on all the elements of both stalking and harassment. In the same vein, we note that Judge DeStefano emphasized in his oral instructions the need for behavior to be repeated in order to constitute the "course of conduct" prohibited by the statute. In that context, he specifically defined the word "repeatedly" as taking place "on two or more occasions." Thus, in analyzing this claim, we begin from the starting point of finding that the judge's oral instructions sufficiently conveyed the elements of stalking and harassment to the jury, and informed the jury of the prohibited "course of conduct," including the requirement for repetition.

A verdict sheet is intended for recordation of the jury's verdict and is not designed to supplement oral jury instructions. *See State v. Reese,* 267 *N.J.Super.* 278, 287, 631 *A.*2d 550 (App.Div.), *certif. denied,* 134 *N.J.* 563, 636 *A.*2d 521 (1993). Although a

verdict sheet should list all elements of each offense, or no elements of any offense, our inquiry focuses on whether the jury understood the elements as instructed by the judge, and was not misled by the verdict sheet. *See ibid.* Where we conclude that the oral instructions of a court were sufficient to convey an understanding of the elements to the jury, and where we also find that the verdict sheet was not misleading, any error in the verdict sheet can be regarded as harmless. *See id.* at 287–89, 631 *A.*2d 550; *State v. Vasquez,* 265 *N.J.Super.* 528, 547, 628 *A.*2d 346 (App.Div.) (finding no reversible error where verdict sheet was erroneous but jury received proper oral instruction, because "[t]he jury is presumed to have understood [the] instructions" (citation omitted)), *certif. denied,* 134 *N.J.* 480, 634 *A.*2d 527 (1993); *see also Sons of Thunder, Inc. v. Borden, Inc.,* 148 *N.J.* 396, 418, 690 *A.*2d 575 (1997) (stating that judge's charge and interrogatories to jury do not provide grounds for reversal unless misleading, confusing, or ambiguous).

 Here Judge DeStefano twice clarified that the verdict sheet was separate from the charge and that its purpose was to assist in reporting the jury's work, not to be evaluated as evidence. *See State v. Burris,* 145 *N.J.* 509, 531, 679 *A.*2d 121 (1996) (acknowledging presumption that juries understand and abide by court instructions, specifically as to proper use of evidence). The record does not provide any basis on which we could reasonably conclude that the jury did not understand the instruction on the lesser-included offense of harassment or the repeated nature of behavior constituting a "course of conduct." *See, e.g., State v. Nelson,* 173 *N.J.* 417, 451, 803 *A.*2d 1 (2002) (finding harmful error arising from "verdict sheet's ambiguous wording, coupled with the jury's clearly confused response ... and the failure of the trial court to obtain clarification for the jury").

Judge DeStefano explicitly and meticulously reviewed the elements of both stalking and harassment with the jury during his oral instructions. Moreover, he encouraged the jury to present any questions of law arising during deliberation to the court for

clarification. While we encourage completeness and consistency in the preparation of verdict sheets, in the absence of some showing that the jury failed to comprehend its duty, we conclude that the oral instructions were sufficient and that the verdict sheet was not misleading. *See Reese, supra,* 267 *N.J.Super.* at 287, 631 *A.*2d 550. Accordingly, we hold that the verdict sheet's failure to use the word "repeatedly" with reference to the course of stalking conduct, and its failure to list the elements of harassment, did not constitute reversible error.

### B.

Defendant also points out that the verdict sheet mistakenly stated that he was charged on Indictment No. 04–04–1007 for stalking between June of 2003 and February 11, *2003,* instead of February 11, *2004.* Once again, the record is devoid of any evidence indicating that this mistake in the verdict sheet misled or confused the jury. And, as with the prior issue, we presume that the jury understood and was guided by the oral instructions which included the correct date from the indictment. *See Vasquez, supra,* 265 *N.J.Super.* at 547, 628 *A.*2d 346.

Generally, a mere, and obvious, typographical error would not have the capacity to mislead the jury as to consideration of the elements of the offenses. We call this error obvious because the ending date to a time period could not precede its beginning date. The jury either did not notice the typographical error, or recognized it as such but recalled the judge's charge reflecting the correct date. Because the jury did not request clarification, it either understood the correct date or did not deem the inaccuracy on the verdict sheet to affect its determination based on the evidence presented and the court's jury instruction.[17] For these reasons, we hold that the error on the verdict sheet does not constitute reversible error.

---

[17] The incorrect date was verbally corrected, yet again, by Judge DeStefano when the verdict was read.

## C.

Finally, defendant resurrects his objection to the use at trial of his statement to officers prior to his arrest outside of M.G.'s home. He claims that the statement should have been suppressed because officers failed to provide *Miranda* warnings before questioning him. This contention was addressed and rejected after a pretrial *Miranda* hearing to determine the admissibility of his November 18, 2002, statements to the police.

Through the testimony of Sergeant Berbrick at defendant's *Miranda* hearing, the State demonstrated that Berbrick and another officer were dispatched to M.G.'s family's home on November 18, 2002, in response to a call for assistance. Upon arrival, Berbrick saw defendant standing on the side stoop of the home, and directed him to move away from the house and stand near the police vehicle with the other responding officer. Defendant complied, and Berbrick went to speak with M.G.'s father to learn what had transpired. In the interim, defendant, who did not demonstrate any desire or intent to leave the vicinity, provided his personal data to the second officer on the scene.

After speaking briefly with M.G.'s father, Berbrick approached defendant. Berbrick testified that it was his intent to ask both parties what had happened, because "we weren't sure what happened at that point. [To have arrested defendant] would be unfair. Anything could have happened that date." However, when Berbrick asked defendant "what happened," defendant blurted out that "he didn't care what the judge said, he was going to come there. He said if we put him in jail, it didn't matter; the day he got out of jail, he was going to come back there anyway." It was only after defendant's blurted-out declaration that Sergeant Berbrick determined to arrest him for stalking.

The motion court credited the testimony of Sergeant Berbrick, which was not refuted by defendant. It found that defendant was neither in custody, nor subject to interrogation at the time of the statement. The court was persuaded that the statement arose in a fast-paced investigation, during which officers separated the

parties and attempted to determine what had transpired. The court noted that there were no handcuffs, it was a residential location, the interaction lasted less than five minutes, and that defendant expressed no desire to leave. Classifying the interaction as a "field inquiry," the trial court ruled that defendant's statements should be allowed into evidence at trial.

The Appellate Division found sufficient credible evidence to support the trial court's findings and affirmed the admissibility of the November 18, 2002, statement. We similarly find no basis for disturbing the findings and conclusions of the suppression court. *See State v. Elders,* 192 *N.J.* 224, 243, 927 *A.*2d 1250 (2007) ("[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." (internal quotation marks and citation omitted)). The law enforcement officers who responded to M.G.'s family home on November 18, 2002, followed to the letter the training expectations for officers responding to domestic disturbances.[18] And, although defendant argues before us that Sergeant Berbrick knew of his prior interactions with M.G. and her family and, therefore, should have given *Miranda* warnings to defendant immediately upon arrival at the scene, it is to the credit of the responding officers that that did not occur. As Sergeant Berbrick testified, "anything could have happened" to bring defendant to the G.'s home, including the possibility, however remote, that the no-contact orders had been lifted since last

---

[18] In support, we take judicial notice of the police officer training module entitled *Interviewing Techniques in Domestic Violence Cases,* which is promulgated by the New Jersey Division of Criminal Justice, a division of the Office of the Attorney General. (Rev. May 2003), available at http://www.nj.gov/oag/dcj/nj pdresources/dom-violence/module-four-student.pdf. The Student Manual directs that officers responding to a domestic disturbance separate the victim from the suspect and interview each party separately. *Id.* at 4–2. It is further suggested that, all the while, officers employ calming techniques to diffuse tensions and that they ask open-ended, non-accusatory questions like, "what happened?" *Id.* at 4–2, 4–3.

Berbrick was involved with defendant. Rather than jumping to conclusions, Sergeant Berbrick conducted a by-the-book domestic disturbance investigation and only determined that defendant should be arrested following his discussion with M.G.'s father and defendant's own unprovoked outburst.

Finding sufficient credible evidence to sustain the motion court's findings, we affirm the trial court's admission of defendant's November 18, 2002, statement at trial.

## V.

For the reasons expressed herein, we affirm, as modified, the judgment of the Appellate Division that upheld defendant's convictions, and we direct that the matter be remanded to the trial court for resentencing as ordered by the Appellate Division.

*For affirmance as modification/remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.