**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1451-16T4

CARCOL ENTERPRISES, LLC,

    Plaintiff-Appellant,

v.

CENTRAL LICENSE BUREAU OF
THE CITY OF ELIZABETH and
CLARA GOODRIDGE,

    Defendants-Respondents.

_____

Submitted February 12, 2018 — Decided July 18, 2018

Before Judges Messano and Vernoia.

On appeal from Superior Court of New Jersey, Law Division, Union County, Docket No. L-0748-16.

Hugo Villalobos, attorney for appellant.

William R. Holzapfel, City Attorney, attorney for respondents (Raymond T. Bolanowski, First Assistant City Attorney, on the brief).

PER CURIAM

    Plaintiff Carcol Enterprises, LLC, appeals from a Law Division order dismissing its complaint in lieu of prerogative writs challenging defendant Central License Bureau of the City of

Elizabeth's (Bureau) suspension and revocation of plaintiff's license to operate its limousine service. Because there was insufficient credible evidence supporting the Bureau's decision to suspend and revoke plaintiff's license, we reverse.

## I.

In pertinent part, Elizabeth City Ordinance No. 3156 (1999), now codified in its City Code, Elizabeth, N.J., Elizabeth City Code ch. 5.20.030 (2017), provides that "[n]o limousine . . . service having its principal place of business in the city shall operate hereafter upon the streets of the city without first complying with the provisions of N.J.S.A. 48:16-14 [and -16 to 18] and receiving" a license. Plaintiff operated a limousine service with its principal place of business in Elizabeth and, for several years prior to 2015, had a limousine license issued by the Bureau.

On March 2, 2015, the Bureau's Chief License Inspector Clara Goodridge sent plaintiff a letter suspending and revoking its limousine license. In the letter, Goodridge asserted plaintiff was "operating an illegal taxicab service" instead of the limousine service the Bureau had licensed. Specifically, Goodridge alleged plaintiff was:

> (1) Not providing a premium ride.
>
> (2) Not providing a premium fare consistent with local area [l]imousine [c]ompanies.

(3) Not keeping proper logs.

(4) Not giving prices to customers.

(5) Not returning to [its] principal place of business after each ride.

(6) Not keeping proper financial records.

Plaintiff appealed the suspension and revocation in accordance with Chapter 5.20.090(C) of the City Code, which provides for an appeal hearing before Elizabeth's "mayor or designee." Elizabeth's Assistant Business Administrator Marie Krupinski was designated hearing officer, and conducted a hearing during which the Bureau called Goodridge as its witness, and plaintiff called its secretary, Maria Mendez, to testify on its behalf.

At the commencement of the hearing, the Bureau's counsel requested that the following documents be respectively marked for "identification" as exhibits C-1 to C-5: the March 2, 2015 letter from Goodridge to plaintiff; a series of pages containing the limousine fares charged by other limousine service companies; a 2010 settlement agreement between plaintiff and Elizabeth; a March 13, 2015 petition containing signatures from Elizabeth taxi drivers complaining about plaintiff's operations; and February 27, 2015 investigative reports from Bureau investigators Mary Aliseo

and Stanley Sremcevic.[1]  Plaintiff's counsel objected to certain documents and, in response, the Bureau's counsel advised that the documents were "only being marked for identification," and that it was therefore unnecessary to address plaintiff's objection. Later in the hearing, the Bureau's counsel also referred to the schedule of fares charged by other limousine services and stated it had not been "introduced yet," but had been marked only for identification.  The Bureau never moved any of the exhibits marked for identification[2] into evidence.

During Mendez's testimony, plaintiff's counsel similarly marked certain documents for identification, such as plaintiff's price sheets, logs sheets, and instructions to drivers and dispatchers, but did not request their admission in evidence.  We therefore limit our discussion of the evidence presented at the hearing to the witnesses' testimony.

Goodridge testified her job responsibilities include oversight of Bureau operations.  She received complaints from

---

[1]  During the colloquy concerning the exhibit including the investigative reports, counsel referred only to Aliseo's report. The record, however, otherwise shows Sremcevic's report was also included in the exhibit.

[2]  During the hearing, the Bureau's counsel also marked for identification copies of the City Code provisions concerning limousine services as exhibit C-6 and the results of a search investigators ran on plaintiff's business as exhibit C-7.

A-1451-16T4

plaintiff's customers, drivers and competitors about its operations and the fares plaintiff charged. She stated she personally called plaintiff at an unspecified time, asked for a taxi, and was told plaintiff would send a vehicle in twenty minutes.

Goodridge provided general and limited testimony concerning the violations alleged in her March 2, 2015 letter. Without describing the sources of her knowledge, she said she discovered plaintiff's drivers were not providing its customers with a "premium ride," which she defined as a prearranged limousine ride during which the drivers open their vehicle's doors for the customers and pull up to the customers' homes instead of picking them up in the middle of the street.

She also testified plaintiff was not charging a "premium fare," as required by state statute. See N.J.S.A. 48:16-13 and -13.1 (defining limousines in part by the requirement that they charge a premium fare). She opined that a premium fare is the customary rate charged by the other limousine service providers licensed by the Bureau, and explained these rates were no less than $40, with some charging either a higher rate or a fixed hourly rate of $40 or more. Goodridge testified plaintiff's records showed it charged rates as low as $8.00, and fares of $12.50 for rides within Elizabeth's city limits, which were only slightly

higher than the $7.00 to $9.00 fares Elizabeth taxis charged for providing the same services.

Goodridge rejected plaintiff's position that its $12.50 fare is a premium fare because it is significantly higher than those charged by taxis. She explained plaintiff was aware it was required to charge fares consistent with "industry standards," because plaintiff agreed to charge such fares under a 2010 settlement agreement between plaintiff and Elizabeth.[3] Goodridge also testified she contacted plaintiff on one occasion, requested the fare for a limousine service within Elizabeth's city limits, and was informed she would be charged $8.00 when, at the time, the other licensed limousine services charged a minimum of $40.00 for the same service.

Goodridge also testified plaintiff did not maintain proper logs detailing the dispatch of its vehicles. The Bureau's counsel marked plaintiff's dispatch log sheets for identification, but Goodridge did not provide any testimony about the alleged manner in which plaintiff failed to comply with any applicable legal requirements related to the completion of the log sheets. As noted, the log sheets were never introduced into evidence before the hearing officer.

---

[3]  The settlement agreement was marked for identification, but was not admitted in evidence during the hearing.

Goodridge testified plaintiff did not provide prices to its customers before a ride was scheduled. Her conclusion was based on the reports of inspectors Aliseo and Sremcevic that were marked for identification but never moved into evidence. Goodridge testified Aliseo and Sremcevic visited plaintiff's office on February 27, 2015, and observed dispatchers arranging rides without first providing customers with the fares. Goodridge also testified that some of plaintiff's log sheets did not include the fares charged, and plaintiff did not provide her with a fare when she called to request a limousine.

Goodridge further opined that Elizabeth's City Code requires that a limousine return to its principal place of business before being dispatched to another a customer. She testified the information on plaintiff's log sheets showed plaintiff did not comply with this requirement.[4]

---

[4] Goodridge misstated the requirements of Chapter 5.20.070(E) of the City Code, which states that a limousine "shall immediately return to its principal place of business after discharging a passenger, unless it is in route to a scheduled pickup." (Emphasis added). Thus, her statement that a limousine is required to return to its principal place of business, and conclusion plaintiff's log sheets established a violation of the City Code merely because they showed the vehicles did not always return to the principal place of business, were incorrect. These errors, however, are of no moment because the hearing officer did not base the revocation of plaintiff's license on any alleged violation of Chapter 5.20.070(E).

Plaintiff presented the testimony of Mendez, who plaintiff first employed in July 2015, following Goodridge's letter notifying plaintiff of the suspension and revocation of its license. Mendez testified the dispatchers are given a document with plaintiff's fares, she monitors the dispatchers' communications with customers, and the dispatchers inform the customers of the fares when a ride is scheduled. She could not, however, testify whether the customers actually agreed to any of the fares she has heard the dispatchers quote over the phone.

Mendez testified the dispatchers enter information on log sheets, including the time of the customer's call, the driver's car and code number and name, the addresses of the customer pickup and delivery, the limousine's license plate number, and the fare. She conceded that some of the log sheets she was shown during cross-examination did not include all of the information plaintiff required of the dispatchers. None of the log sheets were moved into evidence.

According to Mendez, plaintiff's drivers must charge its minimum fares, which are between $12.50 and $14.00 for trips within Elizabeth's city limits. She said the minimum fare for limousine service from Elizabeth to Newark is between $25 to $30, but conceded the log sheets showed a $22 fare was charged for that service.

The hearing officer issued a February 2, 2016 written decision, and made limited and vague factual findings supporting her decision. The hearing officer determined "[i]t was clear from the evidence . . . that there were past violations[,] some of which were corrected." Although the log sheets were not moved into evidence, the hearing officer found that "prices were added at a later date by different persons on the log sheets" and "[t]he handwriting on the log sheets consistently did not match and there were erasure marks in the pricing column."

The hearing officer further determined "it was questionable what fares were being charged to the riders," "many complaints were received by . . . Elizabeth" from plaintiff's competitors that plaintiff "was operating as a taxi and not a limousine" service, and plaintiff "failed to establish" it "charg[ed] limousine[] fares consistent with industry standards for limousines."[5] The hearing officer concluded the Bureau "clearly

_____

[5] To the extent the hearing officer determined plaintiff had the burden of establishing it was charging the appropriate fares, she committed error. See N.J. Dep't of Evtl. Prot., Div. of Solid Waste Mgmt. v. Louis Pinto & Son, Inc., 311 N.J. Super. 552, 554-56 (App. Div. 1998) (noting that the agency seeking to revoke a business or professional license bears "the burden of proof in a revocation proceeding," and that the Administrative Law Judge committed a "critical error" in determining otherwise). On appeal, however, we apply the appropriate standard and determine whether there is sufficient credible evidence supporting the Bureau's suspension and revocation of plaintiff's license.

substantiated" "the major violation of operating a taxi service while holding a limousine license." Based on those limited findings, the hearing officer affirmed the suspension and revocation of plaintiff's license.

Plaintiff filed a complaint in lieu of prerogative writs challenging the hearing officer's decision, claiming it was not supported by substantial credible evidence and should be set aside because the hearing officer was not impartial.

After hearing argument, the court issued a bench opinion finding that although Goodridge's March 2, 2015 letter cited six reasons for the suspension and revocation of plaintiff's license, the hearing officer did not make any findings concerning, or base her decision on, three of the alleged violations. More particularly, the court recognized the hearing officer did not find plaintiff failed to provide a premium ride, require that its vehicle's return to its principal place of business before being dispatched, or keep proper financial records as Goodridge originally alleged.

The court observed that the hearing officer's determination plaintiff operated "a taxi service while holding a limousine license" was based on three findings: prices in the log sheets were consistently altered; there were questions regarding the fares charged to riders; and plaintiff's failure to establish it

10

charged premium fares consistent with industry standards for limousines. The court interpreted the hearing officer's findings to constitute determinations that plaintiff did not charge a premium fare, keep proper logs or give prices to customers prior to scheduling limousine services as alleged in Goodridge's March 2, 2015 letter.

More particularly, the court concluded there was sufficient evidence supporting the hearing officer's determination that the log sheets were altered based on its review of the log sheets that were marked for identification but never moved into evidence. The court found the log sheets showed erasures and alterations of the listed fares, and noted Mendez testified the dispatchers did not have time to enter information on log sheets when limousine services were scheduled. Although the Bureau's investigators never testified, in apparent reliance on Aliseo and Sremcevic's February 27, 2015 investigative reports that were marked for identification but not admitted in evidence, the court determined that "evidence . . . presented by" the investigators showed the fares on the log sheets were altered.

The court also determined there was sufficient evidence showing plaintiff failed to provide fares in advance to customers when its services were scheduled as required under Chapter 5.20.010 of the City Code. In pertinent part, the provision defines

"autocabs," the term used to refer to limousines, to include vehicles that "charge[] a fare or price agreed upon in advance between the operator and the passenger."  The court relied on the log sheets and investigative reports, and concluded there was sufficient evidence showing plaintiff failed to arrange its fares with its customers in advance because fares were entered on the log sheets after the services were scheduled, and the investigators' reports showed that plaintiff's dispatchers did not provide fares to plaintiff's customers when scheduling limousine services on February 27, 2015.  The court also relied on Goodridge's testimony that she called plaintiff to arrange for limousine service and was not provided a fare.  The court also noted Mendez's testimony that she could not confirm the dispatchers always provided customers with a prearranged fare.

Last, the court found N.J.S.A. 48:16-13[6] required that limousine services charge a premium fare, and accepted Goodridge's

---

[6]  In its oral opinion, the court did not refer to N.J.S.A. 48:16-13, but instead cited N.J.S.A. 48:16-17, which pertains to the issuance of a limousine license.  It is clear the judge merely misspoke and intended to cite N.J.S.A. 48:16-13, which is the only applicable statute requiring that limousines charge a premium fare.

We also note that N.J.S.A. 48:16-13.1 provides certain requirements for limousines in counties of the first class with population densities of greater than 10,000 per square mile as established by the most recent United States Census.  The statute requires that limousines charge a premium fare, but has no

testimony that a premium fare is defined by industry standards. The court determined the evidence showed plaintiff charged fares as low as $8.00 and $12.50, and its fares were substantially below those charged by other limousine companies for the same services. The court also found plaintiff understood it was required to charge a premium fare in accordance with industry standards because it agreed to do so in the 2010 settlement agreement with Elizabeth.

The court concluded the hearing officer's decision was supported by substantial credible evidence, the Bureau proved plaintiff was operating as a taxicab company and not a limousine service, and plaintiff failed to demonstrate the hearing officer's decision was arbitrary, capricious or unreasonable. The court determined the evidence showed plaintiff violated N.J.S.A. 48:16-13[7] and Chapter 5.20.070 of the City Code, and entered an order dismissing the complaint. This appeal followed.

Plaintiff presents the following arguments for our consideration:

---

application here because Union County has a population density of only 5216.1 people per square mile according to the 2010 United States Census. See U.S. Department of Commerce, U.S. Census Bureau, QuickFacts Union County, New Jersey, https://www.census.gov/quickfacts/fact/table/unioncountynewjerse y/AGE115210 (last visited July 3, 2018).

[7] See footnote 6, supra.

POINT I

THE SUBSTANTIAL EVIDENCE RULE BARS A FINDING THAT [PLAINTIFF] VIOLATED THE LAW BECAUSE THERE IS NO RESIDUUM OF LEGAL AND COMPETENT EVIDENCE IN THE RECORD TO SUPPORT SUCH [A] FINDING[.]

POINT II

THE ACTION TAKEN BY THE CITY WAS NOT SUPPORTED BY THE RECORD AND WAS ARBITRARY, CAPRICIOUS, DISCRIMINATORY AND UNREASONABLE.

POINT III

THE STATUTORY DEFINITION OF LIMOUSINES DOES NOT APPLY TO [PLAINTIFF] AND THE COURT SHOULD REVERSE THE FINDINGS BELOW.

POINT IV

THE STATE [] AMENDED THE STATUTE[, N.J.S.A. 48:16-22.5] TO EXPLICITLY REMOVE THE RIGHT BY THE CITY TO REGULATE LIMOUSINE FARES[.]

POINT V

THE LOCAL ORDINANCE MARKS THE PATHWAY TO A FINDING OF OPERATING AS A TAXI AND THE DECISION TO REVOKE THE LICENSE OF [PLAINTIFF] DESPITE THE POWER GRANTED BY THE STATUTE TO REVOKE THE LICENSE WAS NOT PROVED BY A FAIR PREPONDERANCE OF THE CREDIBLE EVIDENCE[.]

II.

A municipal agency decision "is subject to review in the Law Division in an action in lieu of prerogative writs[,] . . . and the Law Division's review of the . . . decision must be based solely on the agency record." Willoughby v. Planning Bd. of Twp.

of Deptford, 306 N.J. Super. 266, 273 (App. Div. 1997) (internal citation omitted) (citing R. 4:69). "The Law Division reviews the record to determine whether the . . . factual findings are based on 'substantial evidence' and whether its discretionary decisions are 'arbitrary, capricious and unreasonable.'" Id. at 273-74 (citation omitted).

"When we consider an appeal of a trial court's review of a municipal board's action, we are bound by the same standard as the trial court. We give deference to a municipal board's decision, and such decisions should be overturned only when proven arbitrary, capricious or unreasonable." Cohen v. Bd. of Adjustment of Borough of Rumson, 396 N.J. Super. 608, 614-15 (App. Div. 2007) (internal citation omitted). "[M]unicipal action is not arbitrary and capricious if exercised honestly and upon due consideration, even if an erroneous conclusion is reached." Bryant v. City of Atl. City, 309 N.J. Super. 596, 610 (App. Div. 1998). However, "[a] determination predicated on unsupported findings is the essence of arbitrary and capricious action." Ibid.

Because our review is limited to a consideration of the record before the hearing officer, see Willoughby, 306 N.J. Super. at 273, we observe at the outset that the record consists only of Goodridge and Mendez's testimony. We recognize the informality attendant to the hearing, and that it was not governed by our

Rules of Court or Rules of Evidence, see N.J.R.E. 101(a)(2); R. 1:1-1, but the record shows the skilled attorneys at the hearing had the exhibits marked for identification only, expressly relied on the fact that they were marked only for identification, and never requested that the hearing officer admit the exhibits as evidence or otherwise consider them as part of the hearing record. Indeed, when plaintiff's counsel sought to interpose an objection to certain of the exhibits, the Bureau's counsel avoided any ruling on the objection by twice asserting the exhibits had been marked only for identification. And, in fact, neither party proffered the exhibits to the hearing officer for her consideration as part of the record.

Our review of the Bureau's action is therefore limited to a determination of whether Goodridge and Mendez's testimony constitutes substantial credible evidence supporting the hearing officer's limited fact findings, see Willoughby, 306 N.J. Super. at 273, because their testimony constitutes the sole record before the hearing officer. It was error for the hearing officer and the court to base their respective decisions on the exhibits because there is no showing they were part of the hearing record.

We agree with the court that the hearing officer made only the following three findings supporting her decision that plaintiff was not properly operating as a limousine service:

prices in the log sheets were consistently altered; plaintiff failed to inform customers of the fares when scheduling limousine service; and plaintiff did not charge fares consistent with industry standards for limousines. We therefore consider whether there was substantial credible evidence supporting each finding.

The court determined there was substantial credible evidence supporting the hearing officer's finding plaintiff changed the fares on the log sheets based on the investigative reports and the presence of erasure marks on the log sheets. As noted, the log sheets and investigative reports were not admitted in evidence and they did not constitute evidence supporting the hearing officer's fact-finding. The only testimony concerning erasures on the log sheets came from Mendez, but she stated only that numbers "next to where the fare(s) [were] listed" were erased. She did not testify there were erasures or alterations of the fares listed, and did not explain the significance of the numbers "next to" the fares that were erased. Absent a review of the log sheets, which the Bureau chose not to admit in evidence, Mendez's testimony about the erasures is simply too vague to support a finding that plaintiff changed fares. We are therefore convinced there was no credible evidence in the record supporting the hearing officer's determination the log sheets were not properly maintained because the prices were altered.

A-1451-16T4

We also note that although Chapter 5.20.110 of the City Code requires that a limousine service maintain records showing the "time of departure . . . name and address of the driver . . . license plate number of the vehicle and time of return to the place of business," there is no requirement that fares be recorded. Neither the Bureau nor the hearing officer cites to any legal requirement that plaintiff correctly record the fares charged on its log sheets and, therefore, plaintiff's purported failure to correctly or timely record the fares did not violate any provision of the City Code or other legal standard.

We next consider whether there was evidence supporting the hearing officer's finding that plaintiff failed to provide fares to customers when its services were scheduled as required under Chapter 5.20.010 of the City Code.[8] The provision requires that limousine services "charge[] a fare or price agreed upon in advance between the operator and the passenger."

As the log sheets and investigative reports were not part of the hearing record, they could not support a determination plaintiff does not arrange fares with its customers in advance. The only evidence in the record suggesting plaintiff failed to

---

[8] The hearing officer did not cite to Chapter 5.20.010, but the court correctly recognized the provision defined plaintiff's obligation to arrange fares "in advance."

provide their customers with fares in advance was Goodridge's testimony that on a single occasion she called plaintiff to arrange a limousine service and was not advised of the fare. However, she did not testify she actually arranged a limousine service with plaintiff at that time so the record is bereft of any evidence plaintiff "charge[d] a fare" that was not "agreed upon in advance" in violation of Chapter 5.20.010.

The only other finding of fact supporting the hearing officer's determination plaintiff committed "the major violation of . . . operating as a taxi and not a limousine" is that plaintiff did not charge "fares consistent with industry standards for limousines." To be sure, there was testimony concerning plaintiff's fares. Goodridge testified plaintiff was obligated by law to charge a premium fare, and opined that a premium fare is the minimum fare charged for the same service by other limousine services licensed by the Bureau. She testified that other licensed limousine services charged a minimum fare of $40, and plaintiff charged fares as low as $8.00 and $12.50. Mendez testified plaintiff's minimum fare was $12.50, which is greater than the $7.00 to $9.00 fares Goodridge testified are charged by Elizabeth taxis for the same services. Goodridge also testified plaintiff was aware it was required to charge industry standard fares because it agreed to do so in a 2010 settlement agreement with Elizabeth.

19

The settlement agreement was marked for identification, but was not admitted in evidence, and there was no testimony concerning its terms other than Goodridge's general testimony that it required plaintiff to charge industry standard fares.

The Elizabeth City Code prohibits limousines from operating as taxicabs. See Chapter 5.20.070. More particularly, it prohibits a limousine service from committing six defined forms of conduct: causing a limousine to be parked on a street while waiting to be dispatched or to pick up passengers; driving or cruising in search of, or for the purpose of soliciting, passengers; displaying any sign, soliciting or accepting passengers; dispatching a limousine when a taxicab is requested; failing to return to the limousine service's principal place of business "unless it is in route to a scheduled pick-up[;]" and storing or parking limousines on the City's streets. Chapter 5.20.070(A) to (E).

Neither Chapter 5.20.070 nor any other provision of Chapter 5.20 require that a limousine service charge an industry standards fare, a premium fare, or any other fare, or provide that the failure to charge a particular fare is an indicia of a limousine operating as a taxicab. See Chapter 5.20.010 to 5.20.120. The absence of a City Code provision setting fares for limousine services is in accordance with N.J.S.A. 48:16-22.5, which provides

that the State statutory scheme regulating limousines, N.J.S.A. 48:16-13 to -22.5, shall not "be construed in any way . . . as giving the State or any political subdivision thereof the authority to set or regulate limousine fares . . . ." Thus, the hearing officer's determination plaintiff functioned as a taxicab service instead of a limousine service because it failed to charge industry standard fares could not have been properly founded upon a violation of the City Code.

The hearing officer's determination is untethered to any cited ordinance or statute supporting her decision, but we infer the hearing officer relied on N.J.S.A. 48:16-13, which, in pertinent part, defines a limousine as "any automobile or motor car used in the business of carrying passengers for hire to provide prearranged passenger transportation at a premium fare on a dedicated, nonscheduled, charter basis that is not conducted on a regular route and with a seating capacity of no more than 14 passengers, not including the driver . . . ." (Emphasis added). The Bureau argued before the hearing officer and the court, as it argues here, that N.J.S.A. 48:16-13 requires that plaintiff charge customers a "premium fare," and Goodridge testified that, in her opinion, a premium fare is the minimum fare for the same service charged by the Bureau's other licensed limousine companies.

21

We are not persuaded Goodridge's opinion is correct. "Premium fare" is not defined in N.J.S.A. 48:16-13, and neither this court nor our Supreme Court has interpreted the meaning of the term. The interpretation of a statute is an issue of law that we review de novo. State v. Gandhi, 201 N.J. 161, 176-77 (2010).

"When construing a statute, our primary goal is to discern the meaning and intent of the Legislature. In most instances, the best indicator of that intent is the plain language chosen by the Legislature." Id. at 176 (citation omitted); accord State v. Hudson, 209 N.J. 513, 529 (2012).

> The inquiry thus begins with the language of the statute, and the words chosen by the Legislature should be accorded their ordinary and accustomed meaning. If the language leads to a clearly understood result, the judicial inquiry ends without any need to resort to extrinsic sources.
>
> [Hudson, 209 N.J. at 529.]

N.J.S.A. 1:1-1 provides that "unless inconsistent with the manifest intent of the [L]egislature or unless another or different meaning is expressly indicated," words in a statute shall "be given their generally accepted meaning, according to the approved usage of the language." Where "words and phrases hav[e] a special or accepted" technical or legal meaning, they "shall be construed in accordance with such technical or special and accepted meaning." N.J.S.A. 1:1-1.

A-1451-16T4

"In determining the common meaning of words, it is appropriate to look to dictionary definitions." Macysyn v. Hensler, 329 N.J. Super. 476, 485 (App. Div. 2000). "Premium" is defined as "[a] sum of money paid in addition to a regular price, salary, or other amount; a supplemental amount of money above the normal or standard rate." Black's Law Dictionary 1372 (10th ed. 2014); see also Webster's II New College Dictionary 893 (3d ed. 2005) (defining premium as "[a] sum of money or bonus paid on top of a regular price, salary, or other amount," and as "[a]n unusual or high value"). "Premium rate" is defined as "[a] higher-than-normal amount that one pays for a service, usu[ally] because demand is particularly high at that specific time." Black's Law Dictionary 1372 (10th ed. 2014).

Giving "premium" its generally accepted meaning, the plain language of N.J.S.A. 48:16-13 does not require that plaintiff charge the same fares charged by other licensed limousine services. To the contrary, an interpretation of N.J.S.A. 48:16-13 requiring that all limousine services charge the same minimum fares is inconsistent with the ordinary usage of the term premium. A premium is an "amount of money above the normal or standard rate." Black's Law Dictionary 1372 (10th ed. 2014). Thus, a premium fare could not be the same fare charged by other limousine companies because such a fare would constitute the "normal or

standard rate," and not one above the "normal or standard rate."[9] There is no ordinary usage of the term "premium" supporting the conclusion that N.J.S.A. 48:16-13 requires that plaintiff charge rates consistent with, or defined by, other licensed limousine services. It was error for the hearing officer and court to conclude otherwise.

Determining whether a premium fare is being charged in accordance with N.J.S.A. 48:16-13 requires a comparison to a normal or standard fare. The statute does not define the fare against which the premium fare required under N.J.S.A. 48:16-13 is measured but where, as here, the legislative history is silent as to an intended standard, we turn to the "common-sense of the situation." Bruce Paparone, Inc. v. State, Agric. Dev. Comm., 392 N.J. Super. 391, 401 (App. Div. 2007).

_____

[9] Goodridge did not testify that "premium rate" has a special or technical meaning, and the Bureau does not contend the term has a special or technical meaning. See N.J.S.A. 1:1-1. The Bureau relies solely on what appears to be Goodridge's personal and unsupported opinion that a premium fare under N.J.S.A. 48:16-13 is the minimum fare charged by other limousine services or, in other words, the industry standard. Goodridge also testified plaintiff was aware it was required to charge industry standard fares because it agreed to do so in a 2010 settlement agreement. As noted, the settlement agreement is not part of the hearing record and, even if it was, it could not define N.J.S.A. 48:16-13's requirements. Moreover, Goodridge did not assert in her March 2, 2015 letter, and the hearing officer did not find, that plaintiff's license should be suspended and revoked due to any alleged violation of a 2010 settlement agreement.

The Bureau's claims against plaintiff were based on the premise that plaintiff functioned as a taxicab service and not a limousine service, and limousine services are required to charge fares different than those charged by taxicabs. The Legislature enacted separate provisions in Title 48 concerning taxicabs, N.J.S.A. 48:16-1 to -12, and limousines, N.J.S.A. 48:16-13 to -22.7, and did not require that taxicabs charge a premium rate. See N.J.S.A. 48:16-1. In our view, common sense dictates that the Legislature intended to distinguish limousines from taxicabs in part by requiring that limousines charge a higher rate, or premium fare, than those charged by taxicabs. Thus, we accept plaintiff's contention that it is against the taxicabs' standard or normal rates that we determine whether a limousine has charged the higher, or "premium", fare required under N.J.S.A. 48:16-13.

Goodridge testified the standard taxicab rates for transportation within Elizabeth's city limits was between $7.00 and $9.00. Mendez said plaintiff's minimum fare is $12.50, which is between approximately thirty-eight and seventy-eight percent higher than Elizabeth taxicabs' standard rates.[10] Although Goodridge testified she called plaintiff on one occasion and was

_____

[10] A $12.50 fare is seventy-eight percent higher than a $7.00 rate, fifty-six percent higher than an $8.00 rate and thirty-eight percent higher than a $9.00 rate.

A-1451-16T4

quoted an $8.00 fare, she did not testify plaintiff ever actually charged that fare for its limousine service. In sum, we are convinced the record lacks sufficient credible evidence establishing plaintiff failed to charge a premium fare as required under N.J.S.A. 48:16-13 for its limousine services. The hearing officer's contrary conclusion is "predicated on unsupported findings" and constitutes "arbitrary and capricious action." Bryant, 309 N.J. Super. at 610.

Our holding is limited to the facts presented. We do not establish a formula for the calculation of the premium fare required under N.J.S.A. 48:16-13, but instead leave that determination to the Legislature. See DiNapoli v. Bd. of Educ. of Twp. of Verona, 434 N.J. Super. 233, 238 (App. Div. 2014) ("Courts should be extremely reluctant to add terms to a statute, lest they usurp the Legislature's authority."); Colantoni v. Bd. of Educ. of Twp. of Long Hill, Morris Cty., 329 N.J. Super. 545, 552 (App. Div. 2000) (noting that "we cannot act as a superlegislature and supply an ingredient that is missing from the statutory scheme."); see also In re Proposed Amendment to Title 291, 264 Neb. 298, 301 (2002) (noting the Nebraska Public Service Commission's express definition of "premium fare" for limousines as "a rate based on hourly rental of not less than one (1) hour at fifty dollars . . . per hour with a minimum rental time of one

hour"). We decide only it was error to rely on industry standard fares as the benchmark for determining the premium fare required under N.J.S.A. 48:16-13, and that common sense dictates that limousine fares at least thirty-eight per cent higher than taxicab fares are sufficiently above the normal rate to qualify as the requisite premium fares under the statute. See Bruce Paparone, Inc., 392 N.J. Super. at 401.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION