# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0675-18T4

A.M.,

    Plaintiff-Appellant,

v.

M.H.A.H.,

    Defendant-Respondent.

_____

Submitted October 28, 2019 – Decided January 16, 2020

Before Judges Sabatino, Sumners and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-3276-18.

Lowenstein Sandler LLP, attorneys for appellant (Justin A. Corbalis, on the brief).

Respondent has not filed a brief.

PER CURIAM

Plaintiff appeals from the Family Part's denial of her application for a final restraining order (FRO) against defendant, her estranged husband, under the

Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Her domestic violence complaint alleged defendant committed the predicate acts of assault, harassment, and stalking. She contends the trial court erred in failing to find that she established the predicate act of stalking under the PDVA. Plaintiff also contends the court abused its discretion by refusing to admit into evidence the substance of defendant's text messages and a voicemail sent to plaintiff's cell phone. For the reasons that follow, we vacate the dismissal of the complaint, order reinstatement of a temporary restraining order (TRO) and remand the matter for the court to determine whether an FRO should be issued against defendant.

I.

On June 2, 2018, plaintiff obtained a TRO against defendant under the PDVA based on allegations of assault, N.J.S.A. 2C:12-1, harassment, N.J.S.A. 2C:33-4, and stalking, N.J.S.A. 2C:12-10 (the anti-stalking statute). See N.J.S.A. 2C:25-19(a). Eight days later, an FRO hearing was held in which plaintiff was represented by counsel, and defendant, with the assistance of an Arabic speaking interpreter, appeared without counsel. The following narrative was provided through the parties' testimony.

A-0675-18T4

Not long after the parties' February 2017 marriage, defendant became increasingly paranoid that plaintiff was unfaithful and purchased several devices to spy on her. Beginning in April, plaintiff began finding cameras and voice recorders in their home that were disguised as a wall charger, battery power-pack, wall clock, watch, and a smoke detector. Upon being confronted by plaintiff, defendant confessed to planting the devices, but claimed they were never used.

Plaintiff testified that in November defendant was following her when she left their home. Plaintiff explained that defendant did not have a driver's license, so he would pay people to follow her while he hid in the backseat of the car. She also claimed that almost daily, whenever she would go somewhere, he would appear out of nowhere.

On one occasion in May 2018, plaintiff did not park her car in her usual parking spot at the preschool where she worked. Defendant in turn sent her accusatory text messages claiming he knew she wasn't at work and demanding to know what she was doing. Plaintiff then spotted defendant outside the school. When she complained to him about the situation, he apologized and tried to appease her by offering her chocolate.

A-0675-18T4

Plaintiff also related that in January 2018, after she found another spy device in her house, defendant threatened to tell her family about her alleged unfaithfulness. According to plaintiff, who is Muslim, defendant's accusation of infidelity would cause her family to want to kill her. She therefore cancelled a planned trip to visit her family overseas. Plaintiff claimed defendant informed local shopkeepers and others in their community that plaintiff was unfaithful, thus making it difficult and embarrassing for plaintiff to be seen around town.

When questioned by the court about the alleged threats, defendant stated, "I have nothing against her to begin with, but it just made me so angry that I just said that." On cross examination, defendant stated, "I was just mad and I was just venting. . . . I never talked to her family about the topic at all. . . . I don't have any proof on her that she was cheating." Defendant admitted to only threatening to tell plaintiff's family once, and that plaintiff was lying about him making numerous threats.

On June 2, the relationship became physical during an argument at the parties' home. Plaintiff claimed defendant grabbed her throat and stated, "I swear to God you're going to fucking regret everything and you're going to see what's going to happen to you," until she punched him with her elbow and "pushed him on his chest." According to defendant, plaintiff was pushing him,

so he tried to leave the house, but not before telling her to "go make me food." He then stated, "[she] held me from my arm … and she said where are you going you dog? And then she punched me like five or six punches in my stomach." Defendant claimed he tried to push plaintiff away, but she scratched his face and told him she was calling the cops.

As a result of defendant's conduct, plaintiff stated she shied away from others in public, cried at work, and feared for her safety.

During the hearing, the court denied plaintiff's attempt to admit into evidence several text messages and a voicemail regarding defendant's alleged stalking, all of which were in Arabic. Plaintiff proffered printouts of the text messages with corresponding printouts of English translations. The English versions contained a seal and notary stamp, the handwritten words "translated by," the notary public's signature, and a hand written date. The court found the evidence inadmissible because there was no certification the translation was true. Plaintiff, however, was allowed to testify about the contents of the text messages sent to her and how they made her feel.

Included in the translated text messages were the following statements:

- "You are lying and you didn't leave anything for me to say and I will let Hamada hear all the recorders[.]"

- "And I will make everyone hear the recorders[.]"

- "You know what even the way you breathe is very clear in the recorder yesterday[.]"

- "[Plaintiff], I swear I'm going right now and I will meet with your relatives[.]"

- "I just spoke to Osama and we will meet in Main Street and Ali is coming too[.]"

- "If, you don't answer consider it as [a] threat. I swear to God I'm going by Ali[.]"

- "I'm going toward your uncle['s] house I swear[.]"

- "Come, now to Main Street by yourself before I cause you a big problem with no end. You have only 15 minutes, if you like[.]"

The court further denied plaintiff's request for defendant's interpreter to interpret defendant's voicemail but allowed it to be played so the court could gauge the tone of defendant's voice in the message. Plaintiff then testified that listening to the voicemail made her scared to go home, after which she called friends to stay at her home with her. The translated voicemail revealed:

> Look at me, I know exactly what you are doing. I'm not scared. Fuck the papers and fuck America. You took the phone with you to the bathroom to cause a problem so you can say [I'm] crazy. I swear to you that I watch every detail you do. Just picture how I watch even when you drink water, now you can imagine what I have in my hands? I'm a man who knows what I'm saying and I swear to God you will fucking regret everything; you [plaintiff]. I didn't want to marry you

6

but you begged me now I will show you what I am going to do to you. Do whatever you want. Go call Amman, China, Saudi Arabia, Malta. I don't care. [B]ye[.]

At the hearing's conclusion, the court rendered an oral decision and entered an order vacating the TRO and dismissing plaintiff's complaint. The court determined plaintiff had not met her burden to prove assault; finding it could not believe one party's version of the altercation over the other party. It also found that although defendant's actions were rude and annoying, they did not reach the level of harassment. As for the charge of stalking, despite finding that on at least one occasion defendant placed a device in the home to spy on plaintiff, the court was unpersuaded stalking occurred. The court stated "there is discussion of divorce that's been ongoing for quite some time, obviously claims of infidelity which have not been founded. And I have to find that [defendant's] purpose was to cause the [p]laintiff to fear for her safety." The court found defendant's actions did not rise to the level of domestic violence, ruling:

> Reasonable or not, that's not with the purpose to cause her to fear for her safety. She may have, but the standard is a reasonable person. It's an objective standard, not a subjective standard. So whether this person feared, I can't find that it's reasonable or not, because I don't have anything to base it on. There's no prior history.

7

The court reasoned that because plaintiff knew defendant was following her due to his suspicion of her infidelity, his actions did not rise to the level of domestic violence "from a stalking standpoint."

II.

On appeal, plaintiff raises two points of contention with the trial court's decision. She first contends the court misinterpreted the anti-stalking statute by focusing on defendant's state of mind in direct contravention of State v. Ghandi, 201 N.J. 161 (2010). She next contends the court abused its discretion by refusing to admit into evidence her text messages and voicemail translations or otherwise allow the courtroom interpreter to verify them which would have corroborated her allegations of claims of assault, harassment, and stalking. Before addressing these arguments, we discuss the principles that guide our analysis.

Our scope of review in this circumstance is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). A trial court's fact-finding should be upheld unless it is not supported by "adequate, substantial and credible" evidence. Pascale v. Pascale, 113 N.J. 20, 33 (1988) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). A family court's fact-finding is afforded deference due to its "special jurisdiction and expertise in family matters. . . ."

8

Cesare, 154 N.J. at 413. The "trial court hears the case, sees and observes the witnesses, [and] hears them testify," providing it with a "better perspective than a reviewing court in evaluating the veracity of witnesses." Pascale, 113 N.J. at 33 (quoting Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961)).

This court, however, owes no special deference to the trial court's legal interpretation of a statute, or "the legal consequences that flow from established facts. . . ." Hayes v. Delamotte, 231 N.J. 373, 387 (2018) (quoting Manalapan Realty, LP v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995)).

When determining whether to grant an FRO pursuant to the PDVA, a trial court must make two distinct determinations. Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Under the first Silver prong, "the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. Under the second prong, a judge must determine whether a final restraining order is required to protect the plaintiff from future acts or threats of violence. Id. at 127. In reaching that determination, there must be a finding that "relief is necessary to prevent further abuse." J.D. v. M.D.F., 207 N.J. 458, 476 (2011) (quoting N.J.S.A. 2C:25-29(b)). It is well established the commission of one of the predicate acts of domestic violence set forth in

N.J.S.A. 2C:25-19(a) does not, on its own, "automatically . . . warrant the issuance of a domestic violence [restraining] order." Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995). Although that determination "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127.

A.

Since plaintiff contends the court erred in its interpretation of the anti-stalking statute, we examine the statute and its interpretation, as well as application to the facts of this case. In accordance with N.J.S.A. 2C:12-10(b):

> [a] person is guilty of stalking, a crime of the fourth degree, if he purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his safety or the safety of a third person or suffer other emotional distress.

For the purposes of this statute:

> (1) "Course of conduct" means repeatedly maintaining a visual or physical proximity to a person; directly or indirectly, or through third parties, by any action, method, device, or means, following, monitoring, observing, surveilling, threatening, or communicating to or about a person, or interfering with a person's property; repeatedly committing harassment against a

10

person; or repeatedly conveying, or causing to be conveyed, verbal or written threats or threats conveyed by any other means of communication or threats implied by conduct of a combination thereof directed at or toward a person.

(2) "Repeatedly" means on two or more occasions.

(3) "Emotional distress" means significant suffering or distress.

(4) "Cause a reasonable person to fear" means to cause fear which a reasonable victim, similarly situated, would have under the circumstances.

[N.J.S.A. 2C:12-10(a).]

In Ghandi, our Supreme Court held "that the Legislature intended to cast a wide net of protection for stalking victims by broadly prohibiting and punishing persistent, unwanted, and frightening behaviors." 201 N.J. at 187. The anti-stalking statute was implemented "to intervene in repetitive harassing or threatening behavior before the victim has actually been physically attacked." H.E.S. v. J.C.S., 175 N.J. 309, 329 (2003) (quoting State v. Saunders, 302 N.J. Super. 509, 520 (App. Div. 1997)). Therefore, "acts of actual violence are not required to support a finding of domestic violence." Ibid. Granting an FRO to a victim of stalking "furthers the . . . Act's goal of 'assur[ing] the victims of domestic violence the maximum protection from abuse the law can provide.'" Ibid. (alteration in original) (quoting Cesare, 154 N.J. at 399).

11

Like the situation in this case, H.E.S. involved an estranged husband covertly placing surveillance cameras in his wife's bedroom. 175 N.J. at 314-15. The Court found this to be a violation of the anti-stalking statute given the presence of cameras constitutes repeated action taking place "over a sufficient period or on a sufficient number of occasions to establish a 'course of conduct' under the statute." Id. at 329 (quoting H.E.S. v. J.C.S., 349 N.J. Super. 332, 350 (App. Div. 2002)). The Court rejected the husband's defense that the conduct did not constitute stalking because he did not behave in a threatening manner. Id. at 328. In analyzing N.J.S.A. 2C:12-10(b), the Court adopted a prior statement by our court regarding the anti-stalking statute's elements:

> 1) defendant engaged in speech or conduct that was directed at or toward a person, 2) that speech or conduct occurred on at least two occasions, 3) defendant purposely engaged in speech or a course of conduct that is capable of causing a reasonable person to fear for herself or her immediate family bodily injury or death.
>
> [H.E.S., 175 N.J. at 329.]

About seven years following its decision in H.E.S., the Court expanded on this interpretation of the anti-stalking statute in Ghandi, stating:

> . . . what is most interesting about our opinion in H.E.S., . . . is what was not said. Nowhere did we inquire into or focus on the intent of the defendant in producing fear of bodily injury or death in his victim. Quite the contrary, we firmly established that the appropriate

12

examination for the fact-finder is what a reasonable person, imbued with the personal knowledge and experience of the actual victim, would have experienced as a result of the defendant's conduct. Id. at 330.

In summary, based on the statutory language and the history to the statutory offense of stalking, we do not discern a legislative intent to restrict the applicability of the anti-stalking statute to a stalker-defendant who purposefully or knowingly intended that his course of conduct would cause a reasonable victim to fear bodily injury or death. Rather the plain language of the statutory offense, reasonably read, prohibits a defendant from purposefully or knowingly engaging in a course of conduct, as defined in N.J.S.A. 2C:12-10(a)(1), that would cause such fear in an objectively reasonable person

[201 N.J. at 187.]

Based upon Gandhi and H.E.S., we agree with plaintiff that the trial court misinterpreted the anti-stalking statute by considering whether it was defendant's purpose to cause plaintiff to fear for her safety. Plaintiff testified that she was in fear for her safety due to defendant's conduct. The court did not find the testimony lacked credibility. Of significance, the court found defendant had placed a surveillance camera in the home. It was also uncontroverted that defendant followed plaintiff to and from work on a regular basis and that defendant paid a third party to drive a car following her while he was secreted in the rear seat. Further, plaintiff's testimony that, as a Muslim wife, she could

13

be killed or physically harmed if it was proven she was unfaithful, went unchallenged by defendant. We therefore conclude defendant violated the anti-stalking statute because a reasonably objective person would fear for herself under the totality of these circumstances. The absence of a prior history of domestic violence among the parties does not negate our conclusion.

We must next determine if an FRO was necessary to protect plaintiff "from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127. Because the court found defendant did not commit a predicate act of stalking, it did not decide whether an FRO was necessary. Therefore, we remand for the trial court to consider this issue. Upon receipt of this decision, the court shall immediately reinstate the TRO, which it vacated, and have it served upon defendant.

In remanding, we recognize that almost a year-and-a-half has expired since the court's ruling and we have no knowledge if defendant's conduct towards plaintiff since the ruling would have warranted the need for an FRO. Additionally, as the trial court correctly observed in its dismissal of plaintiff's complaint, plaintiff was not prevented from filing a new complaint and obtaining an FRO against defendant if the situation warranted it. Nevertheless, our decision is based upon the trial evidence and applicable law when this matter

was decided by the court. Nothing in our decision should be interpreted as expressing our view on the result of the remanded proceedings.

B.

Plaintiff argues the trial court abused its discretion by refusing to admit into evidence her cell phone text messages and voicemail translations from Arabic to English. She asserts she substantially complied with the New Jersey Judiciary Language Access Plan (LAP), and where she was not in compliance, the LAP provides exceptions for emergent domestic violence cases like hers. Plaintiff argues that if the text messages and voicemail translations were admitted into evidence, or had the court interpreter been allowed to interpret the text messages and voicemail, it would have corroborated and bolstered her testimony as to the predicate acts of domestic violence alleged in her complaint, resulting in a guilty finding against defendant.

Standard 4.4 of the LAP states "[u]nless otherwise permitted by the court, all evidentiary documents are to be presented in English and all non-English documents intended to be introduced into evidence must be accompanied by a certified translation." Administrative Directive #01-17, "New Jersey Judiciary Language Access Plan" (Jan. 10, 2017). However, under Standard 4.4's Best Practices section, subsection (b), the LAP also provides:

> [I]n certain circumstances a judge may need to assess a recording or text message in a language other than English without the benefit of prior transcription and translation. For example, in an emergent domestic violence hearing, where pretrial discovery is not permitted unless good cause is shown, the judge will generally not require the victim to provide a transcript and translation of a cell phone recording. Instead, the judge may seek to have a court interpreter interpret the recording or text message during the course of the hearing.

We agree with plaintiff that she substantially complied with the LAP, and the court mistakenly applied its discretion by not to allowing her to submit the substance of the text messages and voicemail into evidence, or have the interpreter interpret them. Plaintiff's proposed translation exhibits were notarized, stamped, dated, and signed by a translator, even if they were not "certified translations" as required by the LAP. Our doctrine of substantial compliance avoids the harsh consequences that the court apparently believed it had to adhere to regarding the technical requirements of the LAP and promotes justice and fairness considering plaintiff substantially satisfied the LAP's underlying purpose to provide an accurate translation of defendant's communications. See Galik v. Clara Maass Med. Ctr., 167 N.J. 341, 352 (2001); Anske v. Borough of Palisades Park, 139 N.J. Super. 342, 347 (App. Div. 1976).

16

Plaintiff in fact took steps to comply with the LAP by getting the messages translated, and authenticated by a public notary, despite the LAP expressly suggesting it is not necessary in domestic violence cases. Plus, admission of the evidence would have been fair because there was no prejudice to defendant as he would have had the opportunity to provide his own evidence or explanation on the matter. See Mayfield v. Cmty. Med. Assocs., P.A., 335 N.J. Super. 198, 206 (App. Div. 2000). We further agree with plaintiff that the court should have allowed the courtroom interpreter, who was assisting defendant, to interpret for the court the short and concise text messages and voicemail. Under the circumstances, the court should have admitted this evidence given a clear legislative mandate to prevent domestic violence and the absence of any prejudice to defendant. We, however, limit the admissibility of the text messages and voicemail to the sole issue on remand – whether an FRO should be issued based upon stalking.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0675-18T4