**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2498-17T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOHN P. HARTMAN, a/k/a
BOSTON,

     Defendant-Appellant.

_____

Submitted September 10, 2019 –
Decided August 10, 2020

Before Judges Messano, Vernoia, and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 12-05-0581.

Joseph E. Krakora, Public Defender, attorney for appellant (Daniel Vincent Gautieri, Assistant Deputy Public Defender, of counsel and on the brief).

Christine A. Hoffman, Acting Gloucester County Prosecutor, attorney for respondent (Dana R. Anton and Jonathan E.W. Grekstas, Special Deputy Attorney General/Acting Assistant Prosecutors, on the brief).

PER CURIAM

Defendant John P. Hartman appeals from a judgment of conviction entered following a jury verdict finding him guilty of driving while suspended for a second or subsequent violation of the driving while intoxicated (DWI) statute, N.J.S.A. 39:4-50. Based on our review of the record, we are convinced defendant was denied a fair trial by the court' rejection of his requests to voir dire the jury concerning his insanity defense, and we reverse the conviction and remand for a new trial.

I.

Defendant was first convicted of DWI in 1999. In October 2011, he was convicted a second time, but because his second offense was committed more than ten years after his first, he was sentenced as a first-time offender in accordance with the step-down provision of the DWI statute. See N.J.S.A. 39:4-50(a)(3). The court imposed a seven-month license suspension.

Twenty days later, on November 14, 2011, Monroe Township Patrolman Bruce Maute stopped defendant's vehicle after checking its plates in a database and determining the license of the vehicle's owner, defendant, was suspended. After stopping the vehicle, Maute observed that defendant was its driver. Maute asked defendant if he knew his license was suspended, and defendant replied his

license was "suspended for driving while intoxicated." Maute arrested defendant and a grand jury later charged defendant in an indictment with fourth-degree operating a motor vehicle during the period of a license suspension for a second or subsequent DWI conviction. See N.J.S.A. 2C:40-26(b).

An issue was later raised concerning defendant's competency to stand trial because he suffered a traumatic brain injury two days after his arrest. A psychologist, Dr. Barry S. Kardos, testified at a competency hearing that defendant's brain injury resulted in deficits to his mental organization, articulation, memory, and abstract thinking. Dr. Kardos also explained defendant knew his name, where he lived, his attorney's name, that he faced criminal charges, who the judge and prosecutor were, and "there could be a possible jury trial" on the charge against him. After hearing Dr. Kardos's testimony, the court determined defendant was competent to stand trial.

At trial, the State presented Maute as a witness. Defendant relied on an insanity defense, and called Dr. Kardos, who was qualified as an expert in forensic psychology. Dr. Kardos explained he met with defendant and conducted a psychological evaluation, interviewed defendant's wife and a friend, and reviewed defendant's family's mental health histories and materials from the criminal case. He testified about defendant's mental health history and relied on

defendant's report that on the evening of his arrest, he contemplated suicide and needed to get to his friend's home or "he was going to kill himself." Dr. Kardos testified that on November 14, 2011, defendant did not, and could not, understand operating his vehicle was wrong because he was in the midst of a major depressive episode.

Defendant also called his wife as a witness and three character witnesses. The jury convicted defendant of operating a vehicle while his license was suspended for a second or subsequent DWI violation. The court sentenced defendant to a mandatory 180-day custodial term, see N.J.S.A. 2C:40-26(c), as a condition of two-year's probation. The court stayed service of the custodial portion of the sentence pending the outcome of this appeal.

Defendant presents the following arguments for our consideration:

> POINT I
>
> THE TRIAL COURT DEPRIVED [DEFENDANT] OF A TRIAL BEFORE A FAIR AND IMPARTIAL JURY WHEN [IT] FAILED TO ASK JURORS ADEQUATE QUESTIONS CONCERNING THE INSANITY AND [] DIMINISHED CAPACITY DEFENSES.
>
> POINT II
>
> THE COURT ABUSED ITS DISCRETION IN DETERMINING THAT THE PSYCHOLOGIST RETAINED BY THE DEFENSE WAS NOT QUALIFIED TO PROVIDE AN EXPERT OPINION

4

REGARDING [DEFENDANT'S] COMPETENCE TO STAND TRIAL.

POINT III

THE COURT ERRED IN SUSTAINING AN OBJECTION TO THE DEFENSE PSYCHOLOGIST'S TESTIMONY THAT [DEFENDANT] DID NOT UNDERSTAND WHAT HE WAS DOING AT THE TIME OF THE OFFENSE ON THE BASIS THAT THAT WENT TO THE "ULTIMATE ISSUE" BEFORE THE JURY.

POINT IV

[DEFENDANT'S] MOTION FOR A JUDGMENT OF ACQUITTAL SHOULD HAVE BEEN GRANTED BECAUSE HE COULD NOT BE GUILTY OF VIOLATING N.J.S.A. 2C:40-26[(b)] BY DRIVING WITH A SUSPENDED LICENSE FOR A SECOND DWI OFFENSE WHERE THAT DWI WAS TREATED AS A FIRST OFFENSE PURSUANT TO N.J.S.A. 39:4-50(a)(3).

II.

Defendant claims he was denied a fair trial because the court rejected his requests to voir dire the prospective jurors about whether they could fairly consider his "insanity and diminished capacity defenses." He argues the court erred by failing to ask the jurors questions that would have revealed possible biases and prejudices concerning the insanity defense.

5

Prior to commencement of trial, defense counsel submitted a list of proposed juror voir dire questions to the court. Pertinent to this appeal, defendant proposed three questions related to mental health issues and the following questions about the insanity defense: "Do you believe that insanity is a legitimate defense that relieves someone of criminal responsibility, or do you believe insanity is an excuse that people use to avoid punishment."[1]

The court initially indicated it would ask the jurors the proposed mental health question about whether the jurors or their family members or close friends ever experienced a significant mental health issue. The court denied defendant's request that the two other mental health questions be posed to the jurors.

The court also denied defendant's request the jurors be queried about the insanity defense, stating it would not ask the jurors if they thought the defense was "a good or a bad thing," or "how they feel about the law," and it would tell the jury "what the law is if there is a request for a specific charge" on insanity. Defense counsel persisted, arguing the jury would not have the benefit of the

---

[1] The proposed mental-health-related questions were: (1) "Have you, your family members, or close friends ever experienced a significant mental health issue? If so, how has that affected you?"; (2) "Do you consider mental illness a sickness or a weakness?"; and (3) "Do you believe that someone with a significant mental health issue needs medical treatment or that an individual should be able to deal with such a problem by himself?"

A-2498-17T1

court's instruction on insanity at the time the jury was being selected, and the proposed question was necessary to determine if "there are any biases that may affect the juror's ability to properly serve, or to follow the law." Defense counsel asserted that "it would be appropriate to ask [the jurors] . . . in specific regard to" the insanity defense "given that the . . . defense" had been asserted on defendant's behalf. The court again denied defendant's request.

Defense counsel also requested the court ask a "modified version" of the question concerning the insanity defense, "simply inform[ing] the jury that the insanity defense may be asserted and ask[ing] if . . . there are any reasons . . . they wouldn't be able to follow [the court's] instruction in regards to the same." The court denied the request, again explaining it would instruct the jury concerning the applicable law and the jury's obligation to follow the law as instructed.

The following day, prior to the commencement of the voir dire, the court advised counsel it would not ask the jurors about whether they or their family members had ever experienced a significant mental health issue. The court reasoned the question raised issues under the Health Insurance Portability and

Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1320d to d-9.[2]  In response

to the court's ruling, defense counsel renewed her request that the court voir dire

the jurors about the insanity defense.  The court rejected the request, reiterating

that defendant's proposed question asked the jurors to determine the legitimacy

of the insanity defense and that it was not the jury's duty to make that

determination.

Defense counsel requested the court advise "the jurors that insanity can

be a legitimate legal defense and that if there's any reason they would not be

able to follow the law in regards to that defense, that they should advise the

court as to that during voir dire."  Unpersuaded, the court again stated it would

instruct the jury that it was obligated to follow the law as instructed regardless

of whether they agreed with the law.

Defense counsel again argued "there needs to be some voir dire to ensure

that the jurors will not have any biases that will prevent them from following

that law."  She requested the court inform the jurors "insanity may be a defense

in this case" and ask the jurors if there "is any reason that you would have any

---

[2]  The court's determination that HIPAA precluded defendant's proposed voir dire question is not an issue on appeal.  We observe that neither the court nor the State cited to any HIPAA provision supporting the court's determination.

difficulty" following the law on insanity as instructed by the court. The court denied the request.

The court determined that in lieu of the question concerning whether defendant or his family or friends had experienced a significant mental health issue, it would ask the jurors if they would be able to listen to evidence regarding mental health issues and whether listening to such evidence would affect their ability to be fair and impartial.[3] During the voir dire of the jury, the court did not refer to the insanity defense and did not make any inquiries related to the defense.

Based on that record, we consider defendant's claim the court erred by failing to make any inquiry of the jurors concerning the anticipated insanity defense. "It is axiomatic that an impartial jury is a necessary condition to a fair trial." State v. Papasavvas, 163 N.J. 565, 584 (2000). "'The purpose of voir dire is to ensure an impartial jury' by detecting jurors who cannot fairly decide a matter because of partiality or bias." State v. O'Brien, 377 N.J. Super. 389, 412 (App. Div. 2004) (quoting State v. Martini, 131 N.J. 176, 210 (1993)), aff'd in part, rev'd in part on other grounds, 183 N.J. (2005). Thus, "voir dire acts as a

---

[3] The questions the court posed to the jurors were: "Would you be able to listen to evidence regarding mental health issues? Would it affect your ability to be fair and impartial?"

A-2498-17T1

discovery tool. It is like a conversation in which the parties . . . try[] to reveal the source[s] of any" partiality, prejudice, or bias. State v. Moore, 122 N.J. 420, 446 (1991). To ensure a defendant's right to a fair trial, "a trial court must 'probe the minds of the prospective jurors to ascertain whether they hold biases that would interfere with their ability to decide the case fairly and impartially.'" State v. Winder, 200 N.J. 231, 251-52 (2009) (quoting State v. Erazo, 126 N.J. 112, 129 (1991)).

"Voir dire procedures and standards are traditionally within the broad discretionary powers vested in the trial court and 'its exercise of discretion will ordinarily not be disturbed on appeal.'" Papasavvas, 163 N.J. at 595 (quoting State v. Jackson, 43 N.J. 148, 160 (1964)). "Generally, a trial court's decisions regarding voir dire are not to be disturbed on appeal, except to correct an error that undermines the selection of an impartial jury." Winder, 200 N.J. at 252. However, although "the trial judge possesses 'broad discretionary powers in conducting voir dire . . .[,]' our Supreme Court has [explained] that it will not 'hesitate[] to correct mistakes that undermine the very foundation of a fair trial— the selection of an impartial jury.'" State v. Tinnes, 379 N.J. Super. 179, 184 (App. Div. 2005) (quoting State v. Fortin, 178 N.J. 540, 575 (2004)).

Our examination of the court's refusal to voir dire the jurors concerning defendant's anticipated insanity defense requires that we determine "whether 'the overall scope and quality of the voir dire was sufficiently thorough and probing to assure the selection of an impartial jury.'" Winder, 200 N.J. at 252 (quoting State v. Biegenwald, 106 N.J. 13, 29 (1987)). We consider the issue in the context of well-established principles governing the required voir dire of jurors concerning insanity as a defense to criminal charges.

In Moore, the Court addressed the adequacy of a voir dire of prospective jurors concerning the insanity defense. 122 N.J. at 453-54. The Court found it "well established that many laypersons have a great deal of difficulty in understanding the insanity defense, and many people might not be able to consider it as a viable defense." Ibid. In recognition of those difficulties and inabilities of prospective jurors, the Court "instructed [trial] courts to 'screen out prospective jurors who could not consider an insanity defense due to their prejudices or biases against it.'" Winder, 200 N.J. at 252 (quoting Moore, 122 N.J. at 454). In State v. Harris, the Court reiterated that trial courts are required to "permit a full opportunity to ask prospective jurors about their attitudes toward insanity and mental-health defenses." 141 N.J. 525, 541 (1995).

In Moore, the Court explained that to properly determine if a juror has a bias or prejudice concerning the insanity defense, a trial court should ask "whether a juror can judge the testimony of psychiatric witnesses by the same standard that he or she would apply to the testimony of any other witness." 122 N.J. at 454; see also Winder, 200 N.J. at 253. The Court also attached to its opinion "for guidance to courts" a questionnaire that had been used during a jury voir dire to determine the possible biases and prejudices of potential jurors concerning the insanity defense. Id. at 454, 488-90. The questionnaire included the following two questions that are substantially similar to questions defendant requested, and the court rejected, concerning mental health issues: "Have you or any of your close friends or relatives had any experience with psychiatry[?]" and "Do you believe that everyone can overcome depression and/or other mental negative attitudes merely by becoming more positive in their outlook on life by setting their minds to it?"[4] Id. at 489-90. The questionnaire also included questions concerning juror's views about psychologists, the use of psychiatric

---

[4] These questions are substantially similar to the following questions proposed by defendant and rejected by the trial court: "Have you, your family members, or close friends ever experienced a significant mental health issue? If so, how has that affected you?"; and "Do you believe that someone with a significant mental health issue needs medical treatment or that an individual should be able to deal with such a problem by himself?"

testimony at a criminal trial, and whether the jurors could fairly evaluate psychiatric testimony. Ibid.

In Winder, the Court found the trial court's jury voir dire satisfied the Moore standard because the trial court asked whether the jurors had "experience with psychiatry or psychology"; "ever studied [] psychiatry or psychology"; or knew "anything about the use of psychologists or psychiatrists, during the course of a criminal trial, that would affect in any way [their] ability to judge such testimony fairly and just like anybody else's testimony." 200 N.J. at 253 (alterations in original). The Court found the voir dire "was consistent with [its] exhortations in Moore" and our holding in State v. Murray, where we determined voir dire questions concerning the juror's knowledge or study of psychology and related fields, his or her views on those areas, and whether his or her views would hinder the ability to be fair and impartial "were sufficient to determine if any jurors had biases for or against mental health professionals and mental state defenses," 240 N.J. Super. 378, 392 (App. Div. 1990). 200 N.J. at 252. In Winder, the Court concluded the "[d]efendant points to no specific, essential question that was not sufficiently explored through the court's voir dire" and rejected the defendant's claim the voir dire deprived the defendant of a fair trial. Ibid. The same cannot be said here.

A-2498-17T1

The trial court did not abuse its discretion by refusing to ask defendant's proposed question about the juror's views on the legitimacy of the insanity defense, see Murray, 240 N.J. Super. at 393 (explaining a trial court has discretion whether or not to inquire about attitudes concerning "rules of law"), but defendant modified his request and repeatedly asked for a voir dire focused on the jurors' views on the insanity defense. The court's voir dire did not satisfy the standard established in Moore, applied in Murray, and reaffirmed in Winder. The court did not ask the jurors any of the questions suggested by the Court in Moore and, in fact, refused to ask questions substantially similar to those the Court provided as guidance. The trial court also did not pose any of the questions found essential in Murray and Winder for the voir dire in a case involving an insanity defense. For example, the court did not ask whether the jurors could judge the testimony of a psychologist in the same manner they would any other witness, see Moore, 122 N.J. at 454, or make any other inquiry concerning the jurors' knowledge or opinions concerning psychology and whether the jurors had any biases concerning mental health professionals or the insanity defense.

We are not convinced the only questions the court indulged defendant by asking – whether the jurors "would be able to listen to evidence regarding mental

14

health issues" and whether listening to that evidence would affect their "abilit[ies] to be fair and impartial" – afforded defendant "the full opportunity to ask prospective jurors about their attitudes toward insanity and mental-health defenses" to which he was entitled. See Harris, 141 N.J. at 541; cf. State v. Dunne, 124 N.J. 303, 319 (1991) (rejecting a challenge to a jury voir dire because "the trial court allowed frank inquiry of the potential jurors about their attitudes towards the insanity defense in the circumstances of [the] case").

The court's generic inquiries made no mention of the insanity defense or the juror's views concerning the validity of the psychological sciences and psychological testimony. In our view, the questions are too vague and general to have effectively yielded information concerning the well-established bias and prejudice toward the insanity defense about which the Court expressed its concern, and based its holding concerning the voir dire, in Moore. Indeed, the court's refusal to even mention the insanity defense required juror prescience to convert the generic questions posed into a meaningful inquiry of the area of concern expressed by defense counsel and at the center of the case–defendant's insanity defense.

We are therefore convinced the court's refusal to make inquiries concerning juror's views about the defense, in accordance with the guidance

15

provided by <u>Moore</u> or in the manner found acceptable by the Court in <u>Winder</u>, deprived defendant and the court of the information necessary to "screen out" jurors "who could not consider an insanity defense due to their prejudices or biases against it." <u>Moore</u>, 122 N.J. at 454. We reject the view that merely instructing the jurors to follow the law as given by the court eliminated the need for a voir dire about the insanity defense and the juror's views on psychology and psychological testimony. That view does not adequately protect a defendant's right to information concerning the jurors' possible biases and prejudices relevant to the insanity defense before a jury is selected in the first instance, and its application deprived defendant of a fair trial. <u>See</u> <u>Winder</u>, 200 N.J. at 262. We therefore reverse his conviction and remand for a new trial.

III.

Defendant also argues the court erred by denying his motion for acquittal. He claims he was entitled to dismissal of the charge under N.J.S.A. 2C:40-26(b) because the statute applies only to individuals driving while suspended for a second or subsequent violation of the DWI statute, N.J.S.A. 39:4-50. Defendant relies on the statute's step-down provision, N.J.S.A. 39:4-50(a)(3), and the evidence he had a 1999 DWI conviction, a second DWI conviction more than ten years later on October 26, 2011, and he was arrested and charged on

16

November 14, 2011 for driving a vehicle during a period of license suspension imposed on the second conviction. Defendant contends that because his second DWI conviction was treated as a first offense for purposes of sentencing under N.J.S.A. 39:4-50(a)(3), he cannot be convicted under N.J.S.A. 2C:40-26(b) for driving during a period of license suspension for a second or subsequent DWI offense.

"In assessing the sufficiency of the evidence on an acquittal motion, [a reviewing court] appl[ies] a de novo standard of review." State v. Williams, 218 N.J. 576, 593-94 (2014); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 3:18-1 (2019). We "must determine whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." Id. at 594. We review the trial court's legal conclusions de novo, State v. Handy, 206 N.J. 39, 45 (2011), and statutory interpretation presents an issue of law to which we owe the trial court no deference, State v. Gandhi, 201 N.J. 161, 176 (2010).

Defendant's argument is founded on an incorrect interpretation of N.J.S.A. 2C:40-26(b) and a misapplication of the step-down provision of the DWI statute, N.J.S.A. 39:4-50(a)(3). "When construing a statute, [the] primary goal is to

discern the meaning and interpretation of the Legislature. In most instances, the best indicator of that intent is the plain language chosen by the Legislature." Ibid. (citations omitted); see also DiProspero v. Penn, 183 N.J. 477, 492 (2005). "If the plain language leads to a clear and unambiguous result, then [the] interpretive process is over." Gandhi, 201 N.J. at 177 (quoting Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 195 (2007)).

N.J.S.A. 2C:40-26(b) defines the crime for which defendant was charged and convicted. In pertinent part, the statute provides that it is a fourth-degree crime "to operate a motor vehicle during the period of license suspension in violation of [N.J.S.A.] 39:3-40, if the actor's license was suspended or revoked for a second or subsequent violation of [the DWI statute N.J.S.A.] 39:4-50." N.J.S.A. 2C:40-26(b). This provision simply and unambiguously prohibits an actor from driving a motor vehicle during a period of license suspension for a second or subsequent DWI conviction. The evidence established that is what defendant did here.

At the time of defendant's arrest, he had two prior DWI convictions and he had been operating a vehicle during the period of his license suspension for his second DWI conviction. In fact, the evidence showed defendant drove his

vehicle within three weeks of the court's imposition of a seven-month suspension of his license for his second DWI conviction.

Defendant does not point to any ambiguity in N.J.S.A. 2C:40-26(b), and we find none. He also does not offer any argument that based on the statute's plain language, the State was required to prove anything more than his operation of a motor vehicle during a period of license suspension for a second or subsequent DWI violation. He also does not dispute he had two prior DWI convictions and the State proved he drove a vehicle while his license was suspended for his second DWI conviction. There is nothing in either N.J.S.A. 2C:40-26(b)'s plain language or the evidence presented at trial supporting defendant's claim the court erred by denying his motion for acquittal.

Defendant seeks refuge from N.J.S.A. 2C:40-26(b)'s unequivocal language in the step-down provision of the DWI statute. The step-down provision, N.J.S.A. 39:4-50(a)(3), however, has no application to the crime defined in N.J.S.A. 2C:40-26(b) because it does not define or affect the number of defendant's prior violations of the DWI statute. See State v. Revie, 220 N.J. 126, 139 (2014) (explaining that the step-down provision of N.J.S.A. 39:4-50(a)(3) affects the imposition of a custodial sentence under the DWI motor vehicle statute, not the number of convictions for administrative penalties).

The statute only "'accords sentencing leniency to a driver who is a second and repeat DWI offender where there is a hiatus of ten or more years in between respectively, the first and second, and the second and third infractions.'" State v. Conroy, 397 N.J. Super. 324, 330 (App. Div. 2008) (quoting State v. Lucci, 310 N.J. Super. 58, 61 (App. Div. 1998)). In addition, application of the step-down provision is expressly limited to sentencing under the DWI statute; it provides that where applicable a second conviction may be treated as a first offense "for sentencing purposes." N.J.S.A. 39:4-50(a)(3).

N.J.S.A. 2C:40-26(b) does not criminalize or punish a defendant for prior violations of N.J.S.A. 39:4-50 and does not enhance or affect the sentences for those prior violations. State v. Carrigan, 428 N.J. Super. 609, 624 (App. Div. 2012). A conviction under N.J.S.A. 2C:40-26(b) is for a wholly different offense: driving a vehicle while under license suspension for a second or subsequent DWI violation. Ibid. The step-down provision in N.J.S.A. 39:4-50(a)(3) applies only to sentences imposed for DWI violations and has no application to the offense charged against defendant under N.J.S.A. 2C:40-26(b).

Although he was sentenced as a first offender under the step-down provision, defendant's 2011 conviction constituted his second DWI conviction.

The evidence showed defendant drove during the period of license suspension following his second conviction. The court therefore correctly denied defendant's motion for an acquittal.

IV.

Defendant's remaining arguments concern alleged errors by the trial court during the competency hearing and trial. Defendant claims the court erred by denying his request to qualify Dr. Kardos as an expert on competency issues during the pre-trial competency hearing.

The original competency hearing took place more than three-and-one-half years ago. Thus, if defendant claims he is not competent to stand trial on remand, and the court determines a competency hearing is required, the court will assess the qualifications of whatever experts may be called on at that time to determine if they may testify in the areas in which they are offered. Nonetheless, we address defendant's claim the court erred by rejecting his request that Dr. Kardos be qualified as an expert in competency.

"A trial judge is vested with wide discretion in determining the competency of expert witnesses. An appellate court will not disturb the trial judge's determination 'unless a clear abuse of discretion appears.'" State v. Chatman, 156 N.J. Super. 35, 40 (App. Div. 1978) (quoting Henningsen v.

21

Bloomfield Motors, Inc., 32 N.J. 358, 411 (1960)).  "[A]n appellate court 'may find an abuse of discretion when a decision "rest[s] on an impermissible basis" or was "based upon a consideration of irrelevant or inappropriate factors."'" State v. S.N., 231 N.J. 497, 515 (2018) (second alteration in original) (citation omitted).

"[A]n expert 'must "be suitably qualified and possessed of sufficient specialized knowledge to be able to express [an expert opinion] and to explain the basis of that opinion."'" Agha v. Feiner, 198 N.J. 50, 62 (2009) (quoting Moore, 122 N.J. at 458-59 (alteration in original)).  "In respect of [this requirement] . . . our trial courts take a liberal approach when assessing a person's qualifications." State v. Jenewicz, 193 N.J. 440, 454 (2008).  Thus, "[t]he expert may be qualified on the basis of his experience, even when it is limited." State v. Torres, 183 N.J. 554, 572 (2005).

Here, the court determined Dr. Kardos did not possess sufficient qualifications to testify as an expert on competency.  The court found that most of Dr. Kardos's competency evaluations related to family court matters, and only twelve directly regarded "court time."  The court also found Dr. Kardos did not qualify as an expert in competency because "he's never done the research or the preparation of plans to prepare a person to regain competency."  The court's

view there were weaknesses in Dr. Kardos's qualifications because he had no experience in preparing plans for regaining competency was "not a sound basis for precluding [his testimony]" as an expert witness on competency, and should have been considered by the court, as the fact-finder, only in its determination of the weight to be given to his testimony. Jenewicz, 193 N.J. at 455.

Our reversal of defendant's conviction renders it unnecessary to determine if Dr. Kordas otherwise had sufficient qualifications to testify as an expert in competency or any other area. We offer no opinion on the issue.[5] If there is a competency hearing on remand, the court shall be guided by the applicable legal principles and evidence presented at that time in determining the qualifications of any proposed expert witness.

In any event, the court's decision not to qualify Dr. Kardos as an expert on competency issues would not require a reversal of the court's competency determination and defendant's conviction. The error was harmless because the court qualified Dr. Kardos as an expert in psychology and he testified and offered opinions without restriction on the issues related to defendant's

---

[5] We also offer no opinion on the existence or scope of the area of expertise on "competency" for which Dr. Kordas was offered as an expert.

competency to stand trial under N.J.S.A. 2C:4-4(b).[6]   Defendant makes no showing the court's failure to also qualify Dr. Kardos as an expert on competency issues was clearly capable of producing an unjust result in the competency hearing, R. 2:10-2, and our review of the record reveals no evidence that such a qualification would have affected the substance of the testimony he offered during the hearing.

V.

Defendant also argues the court erred by sustaining an objection to Dr. Kardos's response to a question about whether defendant "understood what he was doing when he drove" on November 14, 2011, stating "I don't think that he understood what he was doing."   Defendant contends the court erred by sustaining the objection to the testimony finding Dr. Kardos improperly opined on the ultimate issue in the case.

Rule 704 provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." N.J.R.E. 704.  "Courts have generally agreed that the admission of psychiatric testimony on the issue of mental state is an

---

[6]  Dr. Kardos was not offered as an expert witness on the issue of competency at defendant's trial.

evidentiary question that should not be unduly restricted." State v. Galloway, 133 N.J. 631, 649 (1993). However, "an expert's 'ultimate-issue testimony' usurps the 'jury's singular role in the determination of defendant's guilt and irredeemably taints the remaining trial proofs,'" State v. J.T., 455 N.J. Super. 176, 215 (App. Div. 2018) (quoting State v. Cain, 224 N.J. 410, 424 (2016)), if the expert, for example, offers an opinion "about [a] defendant's guilt or innocence," State v. McLean, 205 N.J. 438, 453 (2011).

In J.T., we held that a State's expert witness's testimony that "explain[ed] to the jury the concept of 'legal insanity' and then . . . opine[d] on whether [the] defendant's conduct satisfied the elements of this affirmative defense . . . usurped the jury's role by making a definitive declaration of this jury question." 455 N.J. Super. at 215. Here, Dr. Kardos did not offer an opinion defendant was innocent or that defendant satisfied the elements required to establish the insanity defense under N.J.S.A. 2C:4-4(b). The court sustained an objection to Dr. Kardos's testimony concerning defendant's mental state at the time he drove his vehicle–that defendant did not know what he was doing at the time. Such testimony, when offered by a qualified expert, is proper where the mental state of a defendant in a criminal case is at issue. See, e.g., State v. Singleton, 211 N.J. 157, 168-71 (2012) (citing expert testimony supporting an

insanity defense that the "defendant lost his 'ability to regulate . . . his reaction to the world,'" and did not "understand the nature" of his killing spree); Moore, 122 N.J. at 436 (explaining that expert testimony the defendant "was not aware of what he was doing[,] . . . [and] not in control of what he was doing," allowed the jury to determine if the defendant had formed the intent to commit the crimes charged); State v. Nataluk, 316 N.J. Super. 336, 346 (App. Div. 1998) (describing expert's testimony the defendant "was neither aware of what he was doing as he was doing it, nor was he able to comprehend behavior or its consequences" due to his mental illness); State v. Bauman, 298 N.J. Super. 176, 190-91 (App. Div. 1997) (citing defense experts' testimony the "defendant's ability to determine right from wrong was diminished" due to the defendant's "schizoaffective disorder").

Although "considerable latitude is afforded a trial court in determining whether to admit evidence, and that determination will be reversed only if it constitutes an abuse of discretion," State v. Kuropchak, 221 N.J. 368, 385 (2015), the court erred by sustaining the objection to Dr. Kardos's statement based on its finding he offered testimony on an ultimate question in the case. The error, however, was harmless because Dr. Kardos otherwise testified without objection on numerous occasions that defendant did not know what he

was doing when he drove his vehicle.[7]  Thus, the court's decision to sustain the objection to Dr. Kardos's statement was not clearly capable of producing an unjust result.  R. 2:10-2.

To the extent defendant makes any arguments we have not expressly addressed herein, they are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[7]  Dr. Kardos testified twice on direct examination and once on re-direct defendant's major depressive episode prevented him from understanding that driving the vehicle was wrong.  On direct examination, Dr. Kardos testified he did not think defendant knew what he was doing was wrong and the "major depressive episode prevented [defendant] from appreciating and understanding that it was wrong for him to drive."  On re-direct examination, defense counsel asked Dr. Kardos if it was his "opinion that [defendant] didn't understand it was wrong for him to drive at the time[?]"  In response, Dr. Kardos said, "[t]hat's right."

A-2498-17T1